HENRY S. ROWAN *v.* THE STATE BANK, SANDERSON BROTHERS & Co., AND THE UNION ARMS Co.*

[IN CHANCERY.]

(S. C. 36 VT. 124.)

*Chancery. Conditional Sale. Promissory Note. Collateral Security. Contract. Forfeiture of Property by Accession and Confusion. Rights Acquired by Attachment of the Interest of a Conditional Vendee. Accounting. Master's Report.*

A question once decided in a case, is not open for revision in the same case.

On the 21st of September, 1857, the defendants, Sanderson Brothers & Co., and the State Bank, relying upon the representations of the U. A. Co. that the latter had been organized with, and had, sufficient capital and means to enable them to carry out their contract with F. H. & Co. for the manufacture and delivery at certain specified times, of a large number of rifles, the interest of F. H. & Co. in which contract had been assigned to the orator, sold to the U. A. Co. a large amount of machinery, tools, and stock, for the manufacture of guns, upon condition that the title thereof should not pass until the payment of the notes of said company, given in consideration of said sale, and payable on demand. The contract of sale provided, among other things, that all the manufactures, and all the sales and transfers of property, by said company, and of all property arising in whole or in part from the proceeds thereof, should be made with the consent of the agent of said defendants, and that such agent should receive all the proceeds of such sales and transfers, and apply in payment of said notes so much thereof, as, in his judgment, was not necessary for said company to have for the payment of laborers and mechanics, and the purchase of stock.

On the 19th of October, 1857, said contract was modified, at the request of the orator, by a supplemental agreement, which provided that said company might go forward and use the property sold as aforesaid, and make up and deliver to purchasers any portion of said stock, from time to time, as the same should be manufactured and ready for delivery, provided all sales were made by said company with the consent of said agent, and the proceeds thereof paid to him according to the original contract; the said defendants reserving the right to stop all use and sales of said property *on the first, or any subsequent violation of the original contract, touching the said sales and the proceeds thereof.* And it was *held,* that said original contract did not alter or vary the time of payment of said notes.

That the proceeds of the sales and transfers of the property embraced within the terms of said contract, which might be applied to the payment of said notes, were in the nature of collateral security, and that said defendants might collect said notes from other means of said company, or pursue their collateral remedy, or pursue both remedies, until they obtained payment of the notes.

That said supplemental agreement did not make said notes payable by installments, but that it did constitute an agreement that the payments arising from such collateral

* This case was argued at the general term, in November, 1866, and the opinion of the court delivered at the February term, 1867, Windsor County.

security should be made from time to time when said rifles were delivered, and that the said defendants would not, in the collection of said notes according to their tenor, interfere with the property embraced in said conditional sale, unless said company failed to perform the agreement under which they were permitted to use the same.

That, under the circumstances, the right of said company to go forward and use said property as aforesaid, or to retain the possession thereof, also depended upon an implied condition that they would perform their contract with F. H. & Co.

That the orator acquired no such interest in the property embraced in said conditional sale, by virtue of said supplemental agreement, as to embarrass the rights of said defendants in relation thereto.

That the neglect of said company to provide the necessary means for prosecuting the work of manufacturing said rifles, in consequence of which said defendants were compelled to furnish means, or, perhaps, sustain a greater loss, was such a breach of the contract as gave said defendants the right to take and dispose of the property for the purpose for which it was incumbered.

Said U. A. Co. was a corporation organized under the laws of Conn., for the purpose of manufacturing guns, and established in that business at Hartford, in that state, and also carried on the same business at Windsor, in this state. Said original contract provided that all parts of guns, and all materials which should be mingled with the property at Windsor, should, as to the sales and proceeds thereof, be subject to the provisions of said contract relating to the property at Windsor. Said supplemental agreement authorized said company to forward from Windsor to their Hartford factory, any portion of the stock embraced in said original contract; and a portion thereof was forwarded accordingly; so that, on the 3d of April, 1858, the property at Windsor and at Hartford consisted of property embraced in said contract, and of other property belonging to said company, intermingled. *Held*, that the property of said company, so intermingled, became subject to the provisions of said contracts, and that said defendants became mortgagees thereof, and had the right to enter the factory of said company, at both places, and take all of said property.

On the 17th of April, 1858, the business of manufacturing said guns ceased to be done by, or in the name of, said company, and thence, to the last of June, was continued by said defendants, without any agency or interference of said company, during which time said defendants furnished a large amount of new material which was used in the business, and was deemed necessary in order to close the business for the best interest of the defendants and said company. *Held*, that no part of the new material thus used was, on the principle of confusion and accession, forfeited by the defendants, it being necessarily furnished in order to complete the work commenced; but that the same became subject to the provisions of said contract as to the property previously purchased by said defendants.

After the property embraced in said contracts had been taken into the possession of said defendants by the consent of said company, for a breach of the contracts by said company, the orator attached it as the property of the company. *Held*, that the orator thereby became subrogated to the rights of the company in the property, and that the fact that the property was taken by the consent of the company, was important in determining the rights of the company in relation thereto; but that the orator did not thereby acquire any right to interfere with any prior legitimate transaction between the defendants and said company in relation to the property, or to go back, to object to any *bona fide* contract or payment made prior to the attachment.

When one is liable to account for the property of another rightfully taken by him, and which he has managed and disposed of in good faith, and with common prudence and due diligence, he is only liable for the amount actually realized by him.

When property held as collateral security is taken into the possession of the creditor in such an unfinished state that a court of chancery would order it finished by a receiver, and the creditor does in that respect what chancery would have ordered, he is properly chargeable with the avails thereof when finished, notwithstanding it was finished with his property and by his means; but equity requires that the avails thereof should be applied to the extinguishment of the creditor's disbursements in that behalf,

22

before any application is made upon the debt; and any equity acquired by an attachment of such unfinished property as the property of the pledgor, is subordinate to such equity of the creditor.

Although a master's report is not final, it will not, ordinarily, be set aside, unless it appears affirmatively that the master was not warranted in his findings by the evidence, or has erred as to the law applicable to the case.

The conditional vendee of personal property had no attachable interest therein under the statute of 1854, No. 12, when none of the purchase money thereof had been paid by him. BARRETT, J.

APPEAL from the court of chancery. The questions in this case arose on exceptions to the master's report, and the facts are fully stated in the opinion. The court of chancery, at the December term, 1865, in Windsor county, BARRETT, Chancellor, *pro forma*, overruled the exceptions, accepted the report, and dismissed the bill. Appeal by the orator.

*Washburn & Marsh* and *Henry Whittaker*, for the orator.

*Andrew Tracy* and *Peck & Fifield*, for the State Bank and Sanderson Brothers & Co.

The opinion of the court was delivered by

WILSON, J. This bill is brought to render available the orator's attachment of property, of which the Union Arms Company were (as held when the case was before this court in 1863) conditional vendees. The property originally belonged to the Robbins & Lawrence Company. That company, on the 8th of March, 1855, entered into a contract with Fox, Henderson & Co., to manufacture and deliver to them 25,000 Minie rifles. The Robbins & Lawrence Company entered upon the performance of the aforesaid contract, and, for the purpose of facilitating the purchase of materials and the work to be performed in order to a completion of the manufacture and delivery of the rifles at the earliest practicable period, Fox, Henderson & Co. made large advances to the Robbins & Lawrence Company; insomuch that there remained due to Fox, Henderson & Co., on account of such advances, on the 28th of October, 1856, at the time the Robbins & Lawrence Company failed in business and became insolvent, about eighty thousand dollars, which had not been repaid to them by the deliveries

of rifles in pursuance of the provisions of the contract. The Robbins & Lawrence Company only partially performed their contract, when they failed, and became hopelessly bankrupt. At the time of their failure, they were deeply indebted to the State Bank, and Sanderson Brothers & Co., and they attached the property of the Robbins & Lawrence Company, at Windsor, subject to two prior attachments, one of them in favor of the Merchants' Bank, Boston, and the other attachment was in favor of the Ashuelot Bank, of Keene, N. H. In February, 1857, the Union Arms Company was organized as a corporation under the laws of the state of Connecticut, and its stockholders consisted of persons who were creditors of the Robbins & Lawrence Company, and it appears that stock was allotted to them in representation and satisfaction of their debts. The main object proposed to be accomplished by the organization of this corporation, was the resumption and completion of the work on the contract for the .25,000 rifles, originally made by the Robbins & Lawrence Company. It is evident that it was the intention of the Union Arms Company, at the time of its organization, and necessary to a resumption of the work they proposed to undertake, to secure the purchase, or the use at least, of the machinery, tools, and stock, of the Robbins & Lawrence Company, which were then under attachment by their creditors, and to that end, the Union Arms Company, on or about the 1st of July, 1857, obtained a conveyance of the property, subject to all existing incumbrances, and thereupon made application to Fox, Henderson & Co. for a renewal of the contract for the manufacture of the rifles, and for liberty to assume and complete the same. On the 30th of July, 1857, the Union Arms Company made an agreement with Fox, Henderson & Co., in and by which agreement the Union Arms Company adopted, and bound themselves to the performance of, the contract made by the Robbins and Lawrence Company with Fox, Henderson & Co. for the manufacture of the 25,000 rifles, subject only to such modifications as were mutually agreed upon and made therein. The Union Arms Company, in and by their agreement of the 30th July, 1857, promised and agreed to and with Fox, Henderson & Co., that they the Union Arms Company would, on or before the

first day of October, 1857, pay, or otherwise compromise or settle with, all persons whomsoever holding liens, charges, or attachments, on the property, except mortgages, so as to acquire and retain full and undisturbed possession of the premises whereon the manufacture had theretofore been carried on, and of the machinery and stock in trade necessary to the carrying on the same, in order to the fulfillment by them, the Union Arms Company, of their contract with Fox, Henderson & Co.

The State Bank and Sanderson Brothers & Co. having obtained judgments in the suits upon which the property of the Robbins & Lawrence Company was attached on the 28th of October, 1856, the personal property of that company at Windsor, was sold by the sheriff on the executions issued on the aforesaid judgments, at a public sale on the 20th of August, 1857, to the State Bank and Sanderson Brothers & Co., who jointly purchased the same for the protection of their own debts. The rights which the Union Arms Company previously had in the property, were extinguished by the sheriff's sale, and by that sale the State Bank and Sanderson Brothers & Co. acquired title to the same. Under these circumstances, it became necessary for the Union Arms Company to purchase this property of the State Bank and Sanderson Brothers & Co., or make some arrangement with them in relation thereto, in order to commence and go on with the manufacture of the rifles in pursuance of their contract with Fox, Henderson & Co. The State Bank and Sanderson Brothers & Co., on the 21st Sept. 1857, relying upon the representations made to them by the Union Arms Company, that the latter company had been organized with sufficient capital to carry out the contract with Fox, Henderson & Co., that the contract was a profitable one, that the company had the means to carry out the contract without embarrassment, and to remove all liens prior to those of the State Bank and Sanderson Brothers & Co., bargained with the Union Arms Company to sell to them the property in question. The Union Arms Company, in consideration of the proposed sale, executed their note to the State Bank and Sanderson Brothers & Co. for the sum of $39,324.07, with interest, payable on demand; and they executed their note to Sanderson Brothers & Co. for the sum of $12,-.

963.03, with interest, made payable on demand, which sums rep-
resented the indebtedness of the Robbins & Lawrence. Company
to the State Bank and Sanderson Brothers & Co. respectively.
The contract of sale, among other things, provided that the title
to the property should not pass, but should be and remain in the
State Bank and Sanderson Brothers & Co., until the full and com-
plete payment of both of said notes, and of the debt due from
the Robbins & Lawrence Company to the Ashuelot Bank, with in-
terest and costs, and until the full performance of the other con-
ditions named in said contract.  The Union Arms Company, hav-
ing failed to settle with all persons holding liens on the machinery
and stock in trade at Windsor, or to acquire title thereto; having
failed to acquire possession of the aforesaid machinery and stock
in pursuance of their contract of July 30, 1857, with Fox, Hen-
derson & Co., and having failed to perform their contract of Sep-
tember 21st, 1857, with the State Bank and Sanderson Brothers
& Co., and being unable to resume the manufacture and delivery
of rifles without some modification of the latter contract, made
their supplementary agreement with Fox, Henderson & Co., in and
by which, among other things, it was agreed that the Union Arms
Company should resume the manufacture and delivery of the rifles
within two weeks from the date of the aforesaid supplementary
agreement.  The State Bank and Sanderson Brothers & Co., on
the 19th of Oct., 1857, in and by their supplementary agreement
with the Union Arms Company, among other things, so far modi-
fied the terms of their agreement of Sept. 21st, 1857, that the
Union Arms Company, upon the conditions therein named, were
permitted to go forward and use the machinery, stock and tools,
bought at sheriff's sale by the State Bank and Sanderson & Co.,
August 20, 1857; but this supplementary agreement does not af-
fect the former contract in respect to the conditions on which the
title to the property should pass.  Some further notice of the
provisions of these contracts will become necessary in our discus-
sion of other branches of the case.  The Union Arms Company,
having thus effected arrangements in order to commence the work,
on or about the 1st of November, 1857, did commence the manu-
facture and delivery of rifles, and continued the business, under

all the embarrassments incident to the prosecution of a large and unprofitable work without adequate means, until the 3d of April, 1858, when they ceased doing business, having only partially performed their contract with the orator. The State Bank and Sanderson Brothers & Co. then took the property and continued the work, for the protection of their claims, to the last of June, 1858, and after that, from time to time, disposed of it, holding the proceeds to apply in payment of their necessary expenses and disbursements, and in payment of the notes given by the Union Arms Company for the property.

On the 21st of June, 1858, the orator (assignee of Fox, Henderson & Co.) attached the property as the property of the Union Arms Company, while the State Bank and Sanderson Brothers & Co. were in possession of it.   He subsequently recovered judgment against the Union Arms Company for their neglect to perform the Robbins & Lawrence Company contract with Fox, Henderson & Co.   The orator, within ten days after the making of his attachment, commenced this bill, for discovery, account and relief, on the ground of his lien on the property under the attachment.   The bill avers, among other things, that the property received and held by the State Bank and Sanderson Brothers & Co., and the avails thereof by them received, and the money by them received under the several contracts between them and the Union Arms Company, are more than sufficient to pay and discharge the full amount of the promissory notes, and all other sums of money for which the State Bank and Sanderson & Co. hold the property.   The orator also alleged in his bill that if any part of the purchase money remained unpaid to the State Bank and Sanderson Brothers & Co. at the time of the attachment, no payment or tender of payment could, under the circumstances, be made until the amount was ascertained by the intervention of a court of equity, and to this end the orator played for an accounting between the parties.

The answers deny that the State Bank or Sanderson Brothers & Co. have received any money or other property of any kind, with which to pay any part of the notes given for the property. They aver that both notes, together with the interest thereon, re-

main wholly unpaid; that the State Bank and Sanderson Brothers & Co. are the absolute and sole owners of the property, and deny that the Union Arms Company have any interest therein.

The bill was taken as confessed, as against the Union Arms Company. This cause was before this court at the February term, 1863, and was then heard upon bill, answers, and proofs, touching the question whether the Union Arms Company had any attachable interest in the property at the time of the orator's attachment, and this court then decided, (as reported in *Rowan* v. *The Union Arms Company et al.* 36 Vt 124): 1st. That the property was sold to that company by the State Bank and Sanderson Brothers & Co. by a conditional sale, the payment of the purchase money being, by the contract of sale, made a condition precedent to the transfer of the title. 2d. That the property, in pursuance of the contract of sale, passed into the possession of the Union Arms Company. 3d. That a portion of the money to be paid under the contract was paid prior to the orator's attachment. 4th. That the Union Arms Company had an attachable interest in the property, under the provisions of the act of 1854, (No. 12); that the orator, by his attachment of the 21st of June, 1858, acquired a lien upon the property, and the right to assert, in equity, in respect to so much of the property as was on hand at that date, any claim which the Union Arms Company could assert to it. 5th. That where, as in this case, the difficulty to pursuing the legal remedy, consists of a claim to the property attached, by the conditional vendors to the same, and there is a dispute as to how much of the purchase money, if any, is unpaid, so that it is necessary for an accounting to be made by the vendors to determine what is so due, and a bill in chancery is brought by the attaching creditor to obtain such accounting, within ten days after the attachment is made, it cannot be urged, as a bar to the accounting, that the attaching creditor did not pay, or tender to the vendors, the residue of the purchase money remaining unpaid, within ten days after the attachment, as required by the statute; as only the accounting can determine whether the conditional vendors have, or had at the time the property was attached, any claim upon the property attached, which it was necessary for the at-

taching creditor to discharge by payment or tender. The case was remitted to the court of chancery, with a mandate, directing an interlocutory decree that the State Bank and Sanderson Brothers & Co. account before a master for their receipts and disbursements under their contracts with the Union Arms Co. of the 21st of September and 19th of October, 1857 ; and that upon the coming in of the master's report, the cause should be proceeded with in the usual course to a final decree. The cause was referred to a master, before whom the defendants rendered their account. The master made and returned to the court of chancery a very elaborate report in the premises, which was accepted, and, upon the facts reported, the chancellor decreed, *pro forma*, that the orator's bill should be dismissed ; from which decree the orator appealed ; and the cause is now before this court upon exceptions taken by the orator to the report of the master. Various points are taken and urged, which will be considered so far as may be necessary in deciding the case.

It is claimed by the defendants that the Union Arms Company had no attachable interest in the property, and that the orator acquired no lien upon it by his attachment. When this cause was before the supreme court in 1863, it was held that the sale of the property was conditional ; in which the title does not pass from the vendor, nor vest in the vendee, until satisfaction or performance of the condition ; and it became material to determine, before ordering an accounting, whether, at the time of the attachment, there had been a satisfaction of such of the conditions required by the statute, as to enable the orator to attach the property in question as the property of the Union Arms Company. This matter was raised by the bill, answers, and proofs, and was in dispute on the former trial of the cause before this court. It was then found and decided, that, after deducting the interest on the advances and expenses, from five to ten thousand dollars had been received by the State Bank and Sanderson Brothers & Co., to apply in payment of their notes ; consequently, the subject is not open for revision. The defendants, in support of this ground of defence, rely upon the fact found and reported by the master, that, at the time of the attachment, the excess of disbursements

over receipts, was more than $40,000, thus increasing the debt that amount over and above the notes the Union Arms Company were to pay before they had any claim on the property. But the contract of September 21st, 1857, provided that all parts of guns, and all materials which should be mingled with the property at Windsor, should, as to the sales and proceeds thereof, be subject to the provisions applied to the property at Windsor in this contract. The theory of the defence has been, and is, that the whole property which came into the hands of the defendants under the contracts of September 21st and October 19th, 1857, together with the new materials purchased by them, after they resumed possession for the purpose of closing up the manufacture and business, was pledged, mortgaged, or otherwise held, for the payment of their disbursements and the notes, and upon this ground the defendants disposed of the property.

It is insisted by the orator that the acts of the defendants in assuming the possession and in the disposition of the property, were wrongful, and that the account should have been taken against the defendants as wrong doers, with all the liabilities incident to that relation. It is urged by the orator's counsel in support of this proposition, that the contracts of Sept. 21st and Oct. 19th, 1857, constitute an agreement that the notes executed by the Union Arms Company to these defendants, should be paid by installments, at the respective times the guns should be delivered, notwithstanding they were made payable on demand; and that there was nothing due to the defendants at the time they took the property. The contract of Sept. 21st, 1857, provided that all manufactures, transfers, and sales by the Union Arms Company, of any of the property mentioned in this contract, and of property arising in whole or in part from the avails or proceeds thereof, should be made with the consent of the agent of these defendants, that such agent should receive all the proceeds of the sales and transfers of the property, and so much thereof as in his best judgment was not necessary for the Union Arms Company to have for the payment of laborers and mechanics, and for the purchase of stock, he should apply to the payment of the notes to the State Bank and Sanderson Brothers & Co. in

23

proportion to the amount due on each.    It is evident that the parties to this contract understood that the property would, by reason of use, and from other causes, be liable to depreciate in value ; and it is very clear that its provisions were intended to aid the Union Arms Company in the performance of their contract with Fox, Henderson & Co., and to furnish additional security to the State Bank and Sanderson Brothers & Co. for the payment of the notes given for the property.    This contract, in effect, entitled the Union Arms Company, if they performed the other stipulations therein contained to be performed by them, to receive of these defendants such portion of the proceeds of the sales and transfers as should be necessary to enable that company to prosecute the work contemplated in their contract with Fox, Henderson & Co.    But there is nothing in the contract which shows that the parties to it intended to alter or vary the time of payment of the notes ; they still remained payable on demand.    That portion of the proceeds of the sales and transfers arising from the property embraced within the terms of the contract, which might be applied to the payment of the notes, was in the nature of collateral security, and the defendants were at liberty to collect the notes from other means of the Union Arms Company, or to pursue their collateral remedy according to the terms of the agreement, or to pursue both remedies until they had obtained full satisfaction of their debts.    *Root* v. *Lord*, 23 Vt. 568.    It is claimed by the orator that this contract was not satisfactory to him and the Union Arms Company ; and it would seem that the orator was, by the Union Arms Company, induced to believe that the principal, if not the only, hindrance to the resumption and performance by them of their contract with the orator, might arise from their being deprived of the use of the property at Windsor, contained in the conditional sale, and for the purpose of obviating this objection, the orator required the Union Arms Company to procure some modification of the contract, by means of which they might be secured the right to use the property, and resume and continue deliveries of rifles under their contract with the orator, without interruption from the State Bank and Sanderson Brothers & Co. To this end, the supplementary agreement between the Union Arms

Company and these defendants, of October 19th, 1857, was entered into, by which the contract of September 21st was modified in several essential particulars. The agreement of October 19th, 1857, secured to the Union Arms Company the right to use the property at Windsor for the purpose of resuming and continuing the manufacture and deliveries of rifles under their contract with the orator, so long as they should keep their several agreements in the premises. This agreement did not make the notes of the Union Arms Company to the State Bank and Sanderson Brothers payable by installments; they still remained payable on demand. But the provisions of the contract of October 19th, do constitute an agreement that the payments arising from such collateral security should be made from time to time, when the rifles were delivered, and that the State Bank and Sanderson Brothers & Co. should not, in the collection of the notes according to their tenor, pursue or interfere with the property in question, unless the Union Arms Company failed to perform the agreements under which they were.permitted to use the aforesaid property.

This leads us to consider whether the Union Arms Company did so far fail to perform their agreements of Sept. 21st and Oct. 19th, 1857, as to authorize or justify the State Bank and Sanderson Brothers & Co. in taking the property in the manner disclosed by the proofs in the case. It appears that, on or about the 1st of November, 1857, the work of manufacturing the rifles, under the contract of the Union Arms Company with the orator, was commenced in the name of the Union Arms Company, but it soon became apparent that they had no adequate means for carrying on the work, and it was prosecuted principally with the means and at the expense of the State Bank and Sanderson Brothers & Co., until the 3d of April, 1858 From the time the work commenced, to the 3d of April, the disbursements of the State Bank and Sanderson Brothers & Co. for laborers and mechanics, for stock and other necessary expenses in the prosecution of the work, and for payments of debt, which the Union Arms Company agreed, but failed, to pay, and the receipts of the State Bank and Sanderson Brothers & Co. were as follows, viz.: Their disbursements in the month of November, 1857, were $2,811.58, during which month

they received nothing to apply towards their disbursements, nor on their notes. In December, their disbursements were $9,215.77, and their receipts were $8,838.89 ; excess of disbursements over their receipts to January 1st, 1858, $3,188.46. In the month of January, 1858, their disbursements were $11,269.34, and their receipts were $13,299.44 ; excess of disbursements over receipts to February 1st, 1858, $1,158.36. In the month of February, 1858, their disbursements were $11,162.18, and their receipts $10,701.22 ; excess of disbursements over receipts to March 1, 1858, $1,619.32. In the month of March, 1858, their disbursements were $15,602.71, and their receipts $4,398.89 ; excess of disbursements over receipts to April 1st, 1858, $12,823.14. From April 1st to April 3d, inclusive, their disbursements were $7,820.-07, and their receipts were $5,291.00 ; excess of disbursements over receipts on the 3d of April, 1858, when the work stopped, $15,352.21.

It is established by satisfactory proof, that on the 3d day of April, 1858, at the time the State Bank and Sanderson Brothers & Co. took possession of the property, the notes executed to them by the Union Arms Company, remained wholly unpaid. But it is claimed by the orator that the State Bank and Sanderson Brothers & Co. reserved to themselves the right only, " to stop all use and sales of the property by the Union Arms Company on the first, or any subsequent violation of their agreement, touching the sales and proceeds thereof," and the orator insists that inasmuch as the State Bank and Sanderson Brothers & Co. had received the entire proceeds of the sales and transfers of the property, the Union Arms Company, at the time they were deprived of the property, had not broken their contract, and that the assumption of the property by these defendants, was wrongful. We understand this position of the orator is, that the agreement of Oct. 19th contains no condition, express or implied, upon the performance of which by the Union Arms Company their right to use the property depended, except that " touching the sales and proceeds thereof " ; and in order to determine whether this conclusion should be admitted, some further consideration of the agreement becomes necessary. The agreement of October 19th contains, among other things, the

following stipulations, viz., " That the Union Arms Company may go forward and use the machinery, stock, and tools, bought of the sheriff of Windsor, Vt., by the party of the first part (the State Bank and Sanderson Brothers & Co.), August 20th, 1857, and may forward from Windsor to Hartford, and make up and deliver to the purchasers thereof, any portions of such stock, from time to time, as the same shall be manufactured and ready for delivery —provided all sales of such property are made by said Union Arms Company with the consent of the agent of said party of the first part, and the proceeds thereof are paid to him according to the contract signed by the said party of the first part, bearing date Sept. 21st, 1857, to which this is annexed ; *the State Bank and Sanderson Brothers & Co. reserving to themselves the right to stop all use and sales of said property by said Union Arms Company, on the first, or any subsequent, violation of the said agreement, touching the said sales and proceeds thereof.* Also, all rifles accepted by the war department of the British government may be delivered to said government without consent of said agent ; provided said proceeds are all paid over to said agent for said State Bank and Sanderson Brothers & Co." This agreement contains a further stipulation, " that all proceeds of sales of any of said property shall be paid over to the agent of the State Bank and Sanderson Brothers & Co." It should be observed that, at the time this agreement was made, the Union Arms Company had assumed the contract of the Robbins & Lawrence Company for the manufacture of the 25,000 rifles, and had agreed with Fox, Henderson & Co. that the Union Arms Company would pay all claims, or otherwise compromise and settle, on or before the 1st of October, 1857, with all persons whomsoever holding liens, charges, or attachments, on the property (except mortgages), so as to acquire and retain full and undisturbed possession of the premises whereon the manufacture had been carried on, and of the machinery, stock in trade, and tools, necessary to the carrying on thereof, in order to the fulfillment by them, the Union Arms Company, of their contract with Fox, Henderson & Co.

The Union Arms Company had failed to make any compromise or settlement, or to acquire possession of the property ; and by

their supplementary agreement with the orator, of October 19th, 1857, the time within which they should acquire the possession of the property, and commence the manufacture and delivery of rifles, under their contract with him, was extended two weeks from the date of the aforesaid supplementary agreement. The contracts thus assumed by the Union Arms Company, required them to manufacture and deliver to the orator, 800 rifles per month, in and for the months of October, November, and December, 1857, and January, 1858, and to make deliveries of 1000 rifles per month, for every month thereafter, while the aforesaid contracts should be pending; the same to be the least amount of deliveries per month; which contracts were in full force at the time of the making of the agreement between the Union Arms Company and these defendants, October 19th, 1857. No question is made but that the agreement between the Union Arms Company and the orator, and the agreement between the Union Arms Company and the State Bank and Sanderson Brothers & Co., were made in good faith, and with the expectation that they would be strictly observed and performed. What, then, did the Union Arms Company, the State Bank, and Sanderson Brothers & Co., *intend* and *understand* by the stipulation or clause in their agreement of October 19th, which allowed the Union Arms Company *to go forward and use the machinery, stock, and tools?* Considering this stipulation or clause, in connection with other stipulations in the agreement, in the light of surrounding circumstances, and with a view to the obvious and admitted intention and understanding of the parties, we think the right of the Union Arms company "to go forward and use the machinery, stock, and tools," or to retain the possession of the same, depended upon an implied condition that they would *go forward* and use them, and manufacture and deliver rifles, within the respective times stipulated in their contract with the orator. It is evident that the Union Arms Company was allowed to use the property, with the understanding, and upon condition, they would perform their contract with the orator, and not in view of profits which might arise from the manufacture of other work. The magnitude of the work which the Union Arms Company had engaged to perform, and the short-

ness of the time in which it was to be completed, forbid the idea that the agreement was entered into with much, if any, reference to the use of the property for ordinary custom work, or in view of proceeds which could be realized therefrom to the State Bank and Sanderson Brothers & Co. If the Union Arms Company had been able to furnish, and had furnished, the means for prosecuting the work, without the aid of the State Bank and Sanderson Brothers & Co., and had manufactured and delivered the number of rifles each month they stipulated to manufacture and deliver, the proceeds thereof, which would have been realized by these defendants, prior to the 1st of June, 1858, would have paid the notes to the State Bank and Sanderson Brothers & Co , and have redeemed the property.

The gross proceeds of the sales and transfers, from the time the work commenced to the 3d of April, 1858, were nearly equal to the amount of the notes to the State Bank and Sanderson Brothers & Co. ; but those proceeds, together with a large sum in addition, were necessary to re-imburse the State Bank and Sanderson Brothers & Co., for money paid out, and for liabilites in-curred, by them, in the manufacture of the rifles. The proofs clearly establish the fact, that the Union Arms Company *did not go forward* and use the property within the meaning of their agreement with the State Bank and Sanderson Brothers & Co. of October 19th, but, on the contrary, wholly neglected to pro-vide means for prosecuting the work, and relied upon the State Bank and Sanderson Brothers & Co. for means, which they had not promised, and were under no obligations to furnish.

The evidence leaves no doubt that the State Bank and Sander-son Brothers & Co. acted in good faith in their efforts to aid the Union Arms Company in performing their contract with the ora-tor. It appears that, so long as the price of the rifles continued equal to the cost of manufacture, the Union Arms Company was allowed the advantage of the contract, notwithstanding they did not furnish the means, nor prosecute the work, according to the agreement and understanding of the parties. But when the price of the rifles was reduced below the cost of manufacture, the State Bank and Sanderson Brothers & Co. did not deem it for their in-

terest to make further investments, in order to the performance of a contract, in respect to which they had incurred no legal or moral obligation, nor to allow the Union Arms Company to make further use of the property at a loss to these defendants.

It is further claimed by the orator that, under the supplementary agreements of October 19th, 1857, he acquired such interest in the possession and use of the property by the Union Arms Company, as to entitle him to require that the defendants should absolutely refrain from any interruption of the performance of the contracts by the Union Arms Company, except for the single cause stated in the defendants' agreement; and it is further claimed by the orator, that he was, by reason of the defendants' agreement, induced to yield rights and grant privileges to which he would not otherwise have consented. It is clear that there is no privity of contract between the orator and these defendants. How far the orator was induced to yield rights or grant privileges to the Union Arms Company, by reason of their agreement with the State Bank and Sanderson Brothers & Co., does not appear; and, under the circumstances, is not important in deciding the case. The orator had full knowledge of the circumstances under which that agreement was entered into, and of its provisions. The presumption is, that the orator duly considered the provisions of the agreement, their advantages and disadvantages to the Union Arms company, in deciding how far that agreement would enable the Union Arms Company to perform their contracts with the orator. There is nothing in the agreement calculated to deceive or mislead the orator in respect to any contract he might have desired to make with the Union Arms Company. It expressly provides, that all the proceeds of the sales and transfers should be paid to the State Bank and Sanderson Brothers & Co., and the Union Arms company could not, by the terms of this agreement, appropriate any portion of them for the payment of laborers, mechanics, or stock, nor for any purpose except that named in the agreement. The orator must have understood that the Union Arms Company would, under that agreement, be required to furnish the means for prosecuting the work, which would require a large and available capital; and, in respect to

the ability of the Union Arms Company to furnish it, the orator took the risk, at least to the extent of his contract with them. The orator did not guaranty that the Union Arms Company should furnish the means for manufacturing the rifles; nor did he furnish security to the defendants for the payment of the rifles. The defendants did not guaranty that the Union Arms Company should perform their contract with the orator, nor agree to furnish capital for that purpose; and upon what principle of law or equity it can be claimed that the consent of the orator was necessary, to entitle the defendants to take advantage of the breach by the Union Arms Company, of their agreement with the defendants, is not shown. We assume that the orator, in the making of his contract with the Union Arms Company, regarded the defendants' agreement with them, as subject to the conditions therein expressed and implied, and liable to become forfeited by reason of non-performance by the Union Arms Company; and it is obvious that the State Bank and Sanderson Brothers & Co. cannot be affected, or in any manner predjudiced, by reason of any importance which the orator attached to the agreement, not justified by its provisions. It appears that, during the time in which the manufacture of the rifles was carried on in the name of the Union Arms Company, the State Bank and Sanderson Brothers & Co., in order to protect their interests, furnished all, or nearly all, the means for prosecuting the work; and, in view of its ultimate completion by the Union Arms Company, a large amount of stock, necessary for manufacturing the rifles, was purchased by the State Bank and Sanderson Brothers & Co., which remained on hand at the time the price of the rifles was reduced below the cost of manufacture; in the disposition of which stock, the State Bank and Sanderson Brothers & Co. were liable to sustain damage; and we think it would be unjust to require them to sustain the loss resulting from the breach of a contract to which they were neither a party nor privy.

It is conceded by the orator that the Union Arms Company relied principally upon the performance by them of their contract with him, and upon the proceeds of the rifles, for making payment to the State Bank and Sanderson Brothers & Co., of their claims,

24

and the fact is conclusively established that the Union Arms Company had no other means, nor does it appear that they expected to be able to obtain other means, for making such payment.

The correctness of the views entertained by the court, and herein expressed, in respect to the interpretation and meaning of the agreement between the Union Arms Company and these defendants, of October 19th, 1857, may be illustrated by considering some of the consequences which would be likely to result from a different rule. Suppose the Union Arms Company to have commenced the use of the property under their agreement with the defendants, and the work of manufacturing the rifles under their agreement with the orator, and to have furnished the means and manufactured twenty-five rifles per month, or other work equivalent, and the proceeds of the sales to have been received by the State Bank and Sanderson Brothers & Co., which would not pay the annual interest on their debts; no one, we think, would insist that such limited use of the property would constitute a performance by the Union Arms Company of their contract with these defendants; nor would it be contended that the language of the agreement required an interpretation which might render it necessary to keep the agreement on foot during the natural lives of the parties. If it be true, as claimed by the orator, that the State Bank and Sanderson Brothers & Co. had no right "to stop the use and sales of the property" by the Union Arms Company, except for violation by them of their agreement "touching the sales and proceeds thereof," how would the matter stand if the Union Arms Company had manufactured only one rifle per month, and allowed the defendants to direct the sale and receive the proceeds thereof; would it be claimed that such use of the property would constitute a performance of the stipulation which allowed the Union Arms Company "to go forward and use the property and manufacture rifles"? Clearly not. But it might be said that the Union Arms Company would not, in either of the cases supposed, be at liberty to retain the property beyond the time limited for the performance of their contract with the orator. However this might be if the orator did not extend the time of its performance, the proposition of the orator is none the less unsound, for neither

party could, under such rule of interpretation, derive any benefit from the provisions of the agreement. Suppose the Union Arms Company had taken possession of the property, but failed to manufacture any rifles or other work from which these defendants could derive any proceeds in payment of the notes, would such use or non-user of the property constitute a going forward with the work by the Union Arms Company, and a performance of their contract with the defendants? Most certainly not; and this is substantially what the Union Arms Company did, or failed to do, or in other words, the Union Arms Company, from the time the work commenced to the 3d of April, 1858, and thereafter, wholly failed to furnish means and go forward and use the property, under circumstances which would enable the defendants to apply the proceeds of sales upon their notes, as contemplated by their agreement; but, on the contrary, the failure of that company to perform their agreement, largely increased their indebtedness to the defendants.

The bankruptcy of the Union Arms Company, from the time the work commenced, and their total inability to perform their contract with the orator, are fully established by the evidence. Their neglect, from the beginning, to furnish the necessary capital with which to carry on the business, is not accounted for, nor has any attempt been made to account for it, except on the ground of their bankruptcy.

The letter of the president of the Union Arms Company, under date of March 30, 1858, in which that company solicited of the orator an extension of the order originally given to the Robbins & Lawrence Company, contains unmistakable evidence of the inability of the company to perform the existing contract, and of their determination to make no further effort to perform it, except upon the condition suggested. The Union Arms Company in that letter say that, "satisfactory as the progress thus made has been, the directors of the Union Arms Company cannot conceal from themselves that, with all their efforts, difficulties are likely to arrive in the further prosecution of the work, by reason of the augmented scale of deductions to take place agreeably to contract. Hitherto the stipulated rate has allowed them a cash receipt on each rifle de-

livered, of about $9.00 ; under the scale about to come into opera-
tion, they will receive only between five and six dollars per arm.
The cash received, at this diminished rate, will not suffice to pro-
vide for current expenses of workmen, and resort must now be
had to raise money from stockholders of the Union Arms Com-
pany for that purpose, this money going in effect to repay advan-
ces made to the Robbins & Lawrence Company before their fail-
ure, and of which the, Union Arms Company have, in the further
prosecution of the work, no practical benefit.   This state of things,
will necessarily render the working out of the contract a matter
not merely unprofitable, but productive of actual pecuniary loss
to that body.   You will therefore see at once how this fact must
necessarily bear upon any application made by the directors to
the stockholders, who for the most part hold paid up shares allot-
ted in satisfaction of debts against the Robbins & Lawrence Com-
pany, to provide the further capital which will now be necessary,
and how difficult, if not impossible, that task must be, at a time
when the investment of capital in similar undertakings has lately
received, and still experiences, so severe a check."

It was urged by the orator's counsel on the argument of the
case, that there was not in fact any such pecuniary inability on the
part of the Union Arms Company to carry out their contract, as
has been relied upon by the defendants as their jussification for
assuming the possession and absolute disposition of the property
at the time they so interfered.   In support of this proposition, our
attention has been called to the property acquired by the Union
Arms Company prior to the 3d of April, 1858, and to property
owned by them, or in which they had an interest, from the 3d of
April to the time of the orator's attachment.   Without stopping
to inquire what the Union Arms Company might have done if
their property had been free from incumbrance, and available and
sufficient for the prosecution and completion of the work, we deem
it sufficient to say, upon this point, that their property was, by
their own free act, encumbered to such extent that they had no
power to control it as against these defendants, and it is not shown
or even claimed by the orator that the Union Arms Company had,
independent of the right of the defendants, any adequate and

available capital for the prosecution of the work. It is fully established by the testimony of Cutter, Robbins, and others, that the Union Arms Company could, in the further prosecution of the work, derive no practical benefit, that they could not go on with the work, and that they did not desire to involve themselves or their friends any deeper in debt, by further effort to perform a second-hand and worthless contract—a contract which had become worthless in consequence of advances made to, and received by, the Robbins & Lawrence Company.

It is not shown or claimed that the Union Arms Company were in any manner discharged or released from their obligation to furnish capital and go forward with the work, nor were they, prior to the 3d of April, 1858, in any way or manner interrupted by the defendants in the use of the property. The circumstances under which the defendants permitted or suffered the Union Arms Company to retain the nominal use of the property, and the work to continue in their name to April 3d, 1858, constitute no valid answer or ground of defence to the alleged breach of their contract.

The neglect of the Union Arms Company, for so long a period of time, to provide the necessary capital for prosecuting the work, in consequence of which the State Bank and Sanderson Brothers & Co. were compelled to furnish the means, or perhaps sustain a greater loss, thereby rendering it necessary, and giving the right, to apply the proceeds of sales and transfers in a manner and for purposes not contemplated by the terms of the agreements of Sept. 21st and Oct. 19th, 1857, was, on the part of the Union Arms Company, a breach of their agreements with the defendants, which gave the defendants the right to take the exclusive possession of the property, and to dispose of it for the purposes for which it was encumbered. We think it is quite clear that the Union Arms Company consented that these defendants should take possession of the property. The causes of the failure of the Union Arms Company to commence the work, as contemplated by their agreement; their inability before and on the 3d day of April, 1858, to continue the work ; the fact that, in the further prosecution of the work, they could derive no practical benefit, but would incur great

pecuniary loss; the claims of the defendants on the property; the taking possession thereof by them under their title, and without objection from the Union Arms Company; the exclusive use and disposition of the property by the defendants, within the knowledge of, and without objection from, the Union Arms Company; leave no doubt in respect to this question.

Nor are the defendants tortfeasors as regards the non-delivery of the first class guns to the British government. The relation of the Union Arms Company and these defendants, was that of debtor and creditor; the interest of the latter in the contract between the orator and the Union Arms Company, was such as usually exists and is manifested by the creditor in the successful prosecution of an enterprise by his debtor, which may afford means for payment. The interests of the defendants, and the protection of those interests, might have required them to furnish funds for the prosecution of the work, so long as the price of the rifles would justify the belief that they should be able to reimburse themselves for such expenditures and also obtain some part of their notes. The act of the defendants in the furnishing of the funds, was voluntary, so far as it related to the orator; and as to the Union Arms Company, it became necessary, in consequence of their bankruptcy and their breach of contract. But there is no evidence in the case that the defendants undertook to carry on the contract of the Union Arms Company, or that the defendants incurred any liability in respect to the delivery or non-delivery of arms to the British government.

The bill alleges that the State Bank and Sanderson Brothers & Co., in addition to the machinery, stock, and other property purchased by them at the sheriff's sale, and by them held under the contracts of Sept. 21st and October 19th, 1857, had and still hold large amounts of personal property and securities, or the avails thereof, which they received from the Robbins & Lawrence Company, or from Robbins & Lawrence, previous to the sheriff's sale, as collateral security for the debts severally due to them from the Robbins & Lawrence Co., for which they ought to account towards the amount due them upon the notes executed to them by the Union Arms Company, before the application thereon of any part of

the avails of the stock, machinery, and other property mentioned in the contracts of Sept. 21st and October 19th, 1857.

The State Bank, in their answer, deny that they have in their possession any personal property or other security, or the avails thereof, to hold for any purpose, received from the Robbins & Lawrence Company, or from Robbins & Lawrence, before or since the sheriff's sale, excepting that, before the sheriff sale, the Robbins & Lawrence Company delivered to the State Bank 200 Minie rifles of the second class, which, when sold, to the. extent of the avails thereof, the State Bank offer to apply on their debt.

The defendants, Sanderson Brothers & Co., deny that they, or either of them, hold, in addition to the property bid off at the sheriff's sale, any personal property or securities which they received from the Robbins & Lawrence Company, or from Robbins & Lawrence, prior to the sheriff's sale, or at any other time, as collateral security for their debt against the Robbins & Lawrence Company, or for any other purpose, excepting the worthless draft mentioned in their answer, and a box of 20 rifles received of the Robbins & Lawrence Company, which these defendants allege were of little or no value, and which were sent back to Windsor, and mingled with the property there. They also admit the receipt of $128, on the 20th of Nov. 1857, for a box of pistols sold by them, and which were received from the Robbins & Lawrence Company prior to the sheriff's sale; and excepting as herein before mentioned, they deny that they, or either of them, ever received from the Robbins & Lawrence Company, or from Robbins & Lawrence, any thing as security for, or to apply towards, their debt against the Robbins & Lawrence Company, or in any other way, that was not applied upon their debt, and fully accounted for before the rendition of their judgment against the Robbins & Lawrence Company.

It does not appear that the defendants hold any property, or that they, or either of them, received any collateral security from the Robbins & Lawrence Company, or from Robbins & Lawrence, which should apply on their debts against the Union Arms Company, excepting the items admitted in their answers.

Rowan v. State Bank et als.

It appears that the property on hand on the 3d of April, 1858, of which the State Bank and Sanderson Brothers & Co:, on that day, took the exclusive possession, consisted of property originally purchased by them, of property which had been purchased by them subsequent to the original purchase and prior to the 3d of April, 1858, and of such property of the Union Arms Company as had been intermingled with that purchased by the State Bank and Sanderson Brothers & Co. It is contended by the orator that the contract of September 21st, 1857, gave the State Bank and Sanderson Brothers & Co. the right to claim the entire avails of any rifles assembled by the Union Arms Company from parts partly existent or manufactured at Windsor, and partly at Hartford, under the contracts, and while those contracts were in the course of performance ; but it is claimed by the orator that the contract did not give the defendants the right to assume possession themselves of any part of the materials at Hartford, or to enter the factory there, or to make use of the machinery, or to assemble a single gun at the Hartford factory. This proposition of the orator amounts to this,—that so long as the Union Arms Company continued in the performance of their contracts with the defendants, the defendants had a right to all the proceeds of the property at Hartford, as well as at Windsor, but when the Union Arms Company failed to perform their contract with the defendants, then the defendants lost, not only this right, but their lien or security under the contracts, on the property so intermingled. We are not prepared to admit the orator's conclusion, for it would allow the Union Arms Company to take advantage of their own wrong. In order to create a lien in favor of the defendants on the property of the Union Arms Company, by reason of the intermixture in pursuance of the contracts of Sept. 21st and Oct. 19th, 1857, it was not essential whether the property was intermingled at Windsor or Hartford, or at both places. The contract of Sept. 21st, in express terms, provided that all parts of guns and all materials which should be mingled with the property at Windsor should, as to the sales and proceeds thereof, be subject to the provisions applied to the property at Windsor in this contract.

The agreement of October 19th authorized the Union Arms Company to forward from Windsor to the Hartford factory, any portions of the stock embraced in the contract of September 21st; and it appears that, prior to the 3d of April, 1858, part of the property purchased by the defendants previous to that date, was forwarded from Windsor to the Hartford factory, and part of it remained at the Windsor factory. The Union Arms Company had at both factories, prior to, and on, the 3d of April, 1858, some parts of guns, and other materials, purchased by them of the Robbins & Lawrence Company; so that, on the 3d day of April, 1858, the property at Windsor and at Hartford consisted of property purchased by the defendants, and of parts of guns and other materials purchased by the Union Arms Company, and intermingled with the defendants' property at Hartford, as well as at Windsor; and the parts of guns and other materials of the Union Arms Company so intermingled, became subject to the provisions of the contracts of September 21st and October 19th, 1857. From this determination of the rights of the State Bank and Sanderson Brothers & Co. in the property, both at Windsor and Hartford, and including that so intermingled, it naturally follows that they could enter the factory at both places, and take their property; and they could, with the consent of the Union Arms Company, assemble guns at the Hartford factory; but, whether the defendants, with or without the consent of that company, entered the factory at Hartford, and made use of the machinery, or assembled guns at that factory, is wholly immaterial so far as relates to the title or right of the defendants to the property in question.

It appears that when the defendants resumed the exclusive possession of the property, they found guns in all stages of manufacture; and they soon commenced finishing off the work which remained unfinished at the time the Union Arms Company suspended business. On the 17th of April, 1858, the business ceased to be done, even in form, by, or in the name of, the Union Arms Company, and these defendants continued the manufacture of guns from that date to the last of June, 1858, without any agency or interference by the Union Arms Company. During

this time the defendants purchased a large amount of new mate-
rials, which went into the manufacture, and were deemed neces-
sary in order to close the business in such manner as their rela-
tion to, and interest in, the property, and the rights of the Union
Arms Company, required.   No part of the property furnished by
the defendants for the prosecution of the work was, on the
principle of confusion and accession, forfeited on the part of the
defendants.   The intermingling of property which took place
prior to the time they resumed possession, was by agreement ; and
the intermingling of the material furnished by the defendants after
they resumed possession, was necessary in order to complete the
work previously commenced.   The new materials so furnished by
the defendants after they resumed possession, became subject to
the · provisions of the contract applicable to the property pre-
viously purchased by them.   The general title to all the property
purchased by the defendants remained in them ; and they became
mortgagees of the property of the Union Arms Company, inter-
mingled in pursuance of those contracts.   Prior to the orator's
attachment, his relation was precisely the same as that of any
other creditor of the Union Arms Company, who had no lien upon
the property.   The orator, by his attachment on the 21st of June,
1858, acquired the right to assert in equity, in respect to so much
of the property as was on hand at that date, any claim which the
Union Arms Company could assert to it.   This right would en-
title him, by making payment or tender of the unpaid purchase
money, and of the expenditures of the State Bank and Sanderson
Brothers & Co., to stand in all the rights of that company, as
between them and these defendants.

   The State Bank and Sanderson Brothers & Co., prior to the
orator's attachment, by their contracts and relation with the
Union Arms Company, and by reason of the breach of those
contracts on the part of that company, had acquired the right to
take and dispose of the property in payment of their claims.
This right existed at the time of the aforesaid attachment, and
the State Bank and Sanderson Brothers, in the exercise of the
right, had resumed, and then held, the exclusive possession of the
property.   Their title to the property, and their interest therein,

authorized them to dispose of it ; and prior to, and at, the time of the attachment, they were disposing of the property for the purpose of reimbursing themselves for their expenditures, and in payment of the notes. The evidence leaves no doubt that the acts of the defendants in their management and disposition of the property, from the time they took possession of it to the time of the orator's attachment (June 21st, 1858), were consented to by the Union Arms Company. The consent of that company was not essential to the exercise by the defendants of their right to take or dispose of the property, but the consent of that company to the acts of the defendants is important in determining the interest the Union Arms Company had in the property, and the right that company could assert to it as against these defendants, at the time of the attachment. The defendants having managed the property, and made sales thereof, in virtue of their title thereto, and by the consent of the Union Arms Company, from the 3d of April to the 21st of June, 1858, and there being no evidence that their management or disposition of the property up to that date, was fraudulent as against the rights of the orator as a creditor, prior to that time, we proceed to consider whether the defendants, in the management and disposition of the property, and in the collection of the proceeds thereof, subsequent to the orator's attachment, acted upon those just and equitable principles which are applicable to the case, and with due reference to the rights of the respective parties interested in the property. These questions arise on exceptions to the master's report. The orator insists that the defendants disposed of certain portions of the property without giving due notice of the time and place, or times and places, when and where the sales would be made ; but we think they gave all the notice the circumstances of the case required. It appears that the defendants sought for purchasers, corresponded with many rifle manufacturers, and others, who would need such machinery or materials, caused a printed circular to be distributed, offering the property for sale ; and the master found that they took all reasonable measures and exercised due diligence to effect a sale. The position of the orator, from the time of his attachment, was such that he must have had such

notice of the proposed sales as was sufficient to put him on in-
quiry, if he desired further information upon the subject. The
orator, or his attorney, understood, at the time of the attachment,
that the defendants claimed title to the property, and the right to
dispose of it, and that they were then engaged in disposing of it
in payment of their debts against the Union Arms Company. It
appears that a portion of the property was sold by the defendants,
by the consent of the orator, pending the injunction, and the in-
junction was dissolved in December, 1858, obviously for the pur-
pose of enabling the defendants to dispose of the remainder.

There is no evidence in the case that the orator desired, or
sought, for further information of the defendants in respect to the
proposed sales, and the natural inference is, that he was willing
they should dispose of the property upon such notice as he under-
stood, or upon reasonable inquiry might have understood, had
been given.

The 3d, 4th, and 9th exceptions proceed on the assumption that
the defendants were bound to account for the property at its value
on the 3d of April, or 21st of June, 1858, without regard to the
avails realized by them. For the reasons already assigned, we
think these exceptions are not well founded. The defendants
were not tortfeasors in taking, nor in disposing of the prop-
erty. The property was thrown upon the defendants in the nec-
essary enforcement of their just claims. The relation of the de-
fendants to the property required them, in the management and
disposition of it, and in the collection of the proceeds thereof, to
act in good faith, and with reasonable care and skill, and to ac-
count only for what they in fact realized, or to account for what
they could have realized with due diligence.

This determination of the principle on which the defendants
are liable to account, must be regarded, we think, as disposing
of the orator's exceptions, so far as they relate to sales made, and
the proceeds thereof collected, in pursuance of the rule above laid
down. But the orator insists under the 6th exception, that the
evidence shows negligence on the part of the defendants, in not
collecting or attempting to collect the claim for rifles sold to the
Mexican government, and it is claimed by the orator that the de-

fendants should be charged with the amount of that debt. This exception concedes that the defendants acted in good faith and with discretion in making the sale upon the security obtained ; and it concedes that the drafts were duly protested for non-payment ; hence, the only question raised by the exception is, whether the defendants, upon the testimony, should be charged with the claim on the ground of negligence in the use of means for its collection of the guarantor. It appears that William and Henry McGraw executed their guaranty for the payment of the drafts in question. It is not claimed by the orator that there was any culpable neglect in regard to proceedings against Wm. McGraw. The testimony tends to show that the defendants, soon after the drafts were protested, made some inquiry in respect to the property of Henry McGraw, and received such information in relation thereto, as satisfied them of his insolvency at the time of the protest ; consequently, no legal proceedings were instituted against him.

The defendants' testimony tended to show that Henry McGraw had no property, and there is no evidence in the case tending to show that he had property at any time after the drafts matured ; consequently, there is no evidence of negligence, unless negligence is to be inferred ; and we think it quite clear that there is nothing in the account given by the defendants of their efforts in respect to the collection of the debt, nor in the cause of their failure to collect it, which would, against the finding of the master, authorize a presumption of negligence on their part.

The master found that the defendants should not be charged with negligence in respect to this claim, and we think his finding is warranted by the evidence. In respect to the sale to Lamson, Goodnow & Co., we think the defendants should only account for what they received for the property. It appears that the defendants took reasonable measures to find a purchaser or purchasers, and that they exercised due diligence to effect a sale of the property, and sold it to the best advantage they could under the circumstances. The property was unsalable, and quite likely it was sold for less than its real value to a person who needed such kind of property ; but it does not appear that there was any negligence

or want of common prudence on the part of the defendants, in making the sale.

The account was properly taken with reference to the vested rights of these defendants and the Union Arms Company, at the time the orator acquired a lien upon the property. The decree, in pursuance of which the account was taken, authorized the master to allow the defendants ; 1st, all payments made by them at the request, or by consent of, the Union Arms Company, prior to the orator's lien, which were understood and treated by the defendants, and the Union Arms Company, as made under and in pursuance of the contracts of September 21st and October 19th, 1857 ; 2d, all payments made by the defendants within the scope of these contracts ; and 3d, all payments made by the defendants which were rendered necessary in consequence of the non-performance by the Union Arms Company, of the aforesaid contracts. The orator, at the time the payments mentioned in the first class were made, did not stand in a position to interfere with any legitimate transaction between the defendants and the Union Arms Company ; nor can he go back and object to any *bona fide* contract or payment made prior to his attachment. It is clear that the disbursements, rendered necessary in consequence of the failure of the Union Arms Company to perform their contracts with the defen iants, were made upon the credit of ·the property. When the defendants took possession of the property on the 3d of April, 1858, a large portion of it was worth but little in the condition in which they found it. It was necessary that the work should be finished, in order to make it the most available to all parties interested ; and the defendants did, substantially, what chancery would have ordered done by a receiver, under our statute. The defendants are charged, and properly charged, with the avails received for all guns manufactured after the 3d of April, 1858, notwithstanding they were manufactured with the defendants' property, or with money furnished by them, and equity requires that their receipts should be applied to extinguish their disbursements, before extinguishing the notes. The master has found that these disbursements were necessary, and we think their allowance is correct. The testimony before the master tended to

show that the defendants, in the management and disposition of the property, in their efforts to collect the proceeds of the sales, in making disbursements, and in all their dealings with the Union Arms Company, connected with or growing out of the contracts, or resulting from the breach thereof, acted in good faith, with discretion and due diligence, and with due regard to the rights of the orator.

In relation to the remaining questions raised by the exceptions, we deem it sufficient to say generally that, in every view we have been able to take of the case, it seems to us that the account was taken upon correct principles, and that the findings of the master are supported by the evidence. Although the report of a master is not conclusive, it will not, ordinarily, be set aside, unless it appears affirmatively that the master was not warranted, upon the evidence, in his finding, or has erred as to the law applicable to the case.

The orator's equity, acquired by his attachment, is subordinate to the equity of the State Bank and Sanderson Brothers & Co. His attachment was made, and this bill is brought, for the purpose of securing to the orator such interest as the Union Arms Company had in the property on the 21st of June, 1858. The account, as taken by the master, and approved by the chancellor and by this court, shows that the avails of the property in question, are insufficient to satisfy the prior legal and equitable claims of the State Bank and Sanderson Brothers & Co., for the payment of which the property was encumbered, and that there is still due to them a large sum on the notes; consequently, the orator can take nothing by his attachment.

The result is, that the decree of the chancellor dismissing the orator's bill, is affirmed, with costs to these defendants. The cause is remanded to the court of chancery, and is to be disposed of accordingly.

BARRETT, J., delivered the following additional opinion:

The magnitude of the case, and the ability of the elaborate arguments addressed to the court at the last general term, when for the first time I participated in the proceedings, lead me to pre-

sent a comprehensive summary of the views upon the leading points upon which I have come to the result announced by Judge WILSON as the judgment of the court. I pass all the details so fully presented and discussed in the elaborate opinion read by him. ·

The bill was framed and based on the ground that, under the contracts set forth. in it between the Union Arms Company and the defendants, the defendants became and were mortgagees of the property specified, which they held as security for the payment of their notes and lawful charges; and that the orator, as creditor of the Union Arms Company, by virtue of his attachment, was entitled to assert the right of that company as mortgagors, and thereby to have an account of all receipts of money and avails of other securities, properly applicable as payment of said notes and other charges; and claimed that such receipts and avails were more than sufficient to pay all that was due to the defendants, and prayed an account accordingly, and an injunction and receiver, and that the surplus of avails from all sources, held or received by the defendants, after satisfying their claims, be held subject to the order of the court to apply on such judgment as the orator should obtain in his suit at law, in which he had made attachment of said property.

The supreme court, when the case was formerly before it, at a session in which I did not participate, ignored the character assumed for the defendants by the orator in his bill, under the contracts and transactions with the Union Arms Company, and held that said company stood in the relation of *conditional vendee* of the property which was the subject of said contracts and transactions; and found from the evidence, as was said, that the defendants had received something to apply on the notes for the payment of which they held a *lien* on the property; and held that it might prove to be the right of the orator under the statute of 1854 to pay the balance of the debt, and hold the property under his attachment—but that, as the matter was situated, the amount to be paid could be ascertained only as the result of an accounting, which a court of chancery alone was competent to order and compel—and on this ground, the court entertained the bill, and ordered an account to be taken.

The bill does not charge any fraud or wrong doing on the part of the defendants, as giving the orator a right, or subjecting the defendants to a liability, or giving ground for a resort to a court of equity. It is based exclusively on the relation of the parties created and fixed by the recited contracts, and on the averred facts that the defendants had received avails of the use of the property in question and of other collateral securities, which, when applied, would wholly pay the debt, and thus relieve the property so as to render it available to the orator under and by virtue of his attachment. The bill stands, not on any ground of duty owing by the defendants directly to the orator, but upon the legal right of the orator to hold by attachment the property of the Union Arms Company ; and it is resorted to as the only means of effectuating that legal right, as to the property encumbered by the debt of the defendants, and to this end, asserts the legal and equitable duty of the defendants to the Union Arms Company to account for, and apply the avails of the securities held by them, in satisfaction of their debt and charges, and to that extent thus yielding the property to the operation of the orator's attachment and final process.

In the relation assigned by the supreme court in this case to the parties under and by force of the recited contracts, the interposition of the court of chancery is accorded only on the ground of the legal right of the orator to reach the property under his attachment in virtue and by force of the specific provisions of the statute of 1854 in behalf of creditors of conditional vendees of personal property, and for the sole purpose of rendering effectual the ordinary *mesne* and final process of the court of law. The judgment and mandate of this court, in pursuance of which the account has been taken, were not based on rights in the orator and correlative duties on the part of the defendants resting in, or arising from, the principles of moral or legal equity operating directly between the orator and the defendants, but upon the legal right of the orator as against the Union Arms Company, and the legal and equitable duty of the defendants to that company. They do not involve or assume any equities as giving the right on the one hand, or imposing the duty on the other, between the orator

26

and the defendants.  The accounting, therefore, was to be such as by the rules of the common and statutory law, and the principles of equity, the defendants were bound to make as between themselves and the Union Arms Company.

The defendants held the title to the property, and were entitled to assert it in a proper manner for the purpose of realizing satisfaction of their debt.  The Union Arms Company had failed to pay it, and on the 3d of April, 1858, abandoned the attempt by the use of the property, pursuant to the provisions of the existing contracts, of trying to pay it.  What was done thereafter in respect to the property and the means in their hands, the master finds to have been done in good faith, in the exercise of proper care, diligence, and discretion, for the purpose of turning such property and means to the best account for the satisfaction of the debt and charges with which said property was burdened. It is specially worthy of notice that at the time this bill was brought, all the acts and transactions between the defendants and the Union Arms Company, and all the acts and transactions of the defendants in taking possession of and holding the property in their own right, and in exclusion of said company, except the subsequent sales of the property, had transpired, and were then in operation and effect ; and yet, there is no averment in the bill, nor finding by the master, nor evidence reported, that the defendants intended or did any thing wrong, unlawful, or inequitable, as against the Union Arms Company.  It would therefore seem difficult to assign a well grounded reason for charge or claim by the orator that the defendants should be affected or held accountable as *wrong-doers* in taking possession of the property in April, 1858.

The master having found, on what would seem to be warrantable and sufficient ground, furnished by the pleadings, orders and proofs, that, in the transactions under the contracts, and in the successive conjunctures that arose in the prosecution of the business under them by the Union Arms Company, which constitute the subject-matter of inquiry, and material elements, in the account to be taken by him, that the defendants acted in good faith, and with proper care, diligence and discretion, it seems quite

clear that the defendants should be held chargeable for only what they in fact realized from the property and means in their hands, and that they should not be subjected to any higher charge, or larger deductions, on the ground assumed in the argument before the master and in this court, viz: that they were *wrong-doers* in taking possession of the property as they did.

Unless the defendants should be thus subjected, and the account taken on the basis that they were *wrong-doers*, the particular items with which it is claimed they should be charged on the one hand, and disallowed to them on the other, would not change the final determination to be made of the case (as for instance, the item of guns sold to the Mexican government, and other things discussed in arguing the exceptions.) I notice again, what has been before intimated, that the grounds upon which the questions now before us have been raised, are not presented by averments in the pleadings, but by the report of the master, and the evidence that was before him in taking the account.

It is firmly settled in this state, that the master's report will be regarded as settling the facts which fall within his province to find, and which he reports as found, unless it appears affirmatively that he has found facts without evidence, or against evidence.

All the questions as to good faith, proper cause and occasion, proper care, diligence and discretion, were raised first before him upon the evidence adduced before him in the accounting he was to take.

This court have revised his findings in these respects, in view of the evidence reported. The result of such revision is, that we see no occasion to impeach or discard his findings upon any of the points vital to the final decision.

The master's report shows that at the time the orator made his attachment, not only had the defendants not received any thing to apply on their notes, but their disbursements exceeded their receipts by $53,820.84, or (disallowing certain items), by $42,312.72. Instead of this debt being diminished, it had nearly doubled at that time. Of course, then, the case did not fall within the provisions of the statute of 1854, giving an attaching creditor a right to pay the balance where part of the purchase

money shall have been paid, and to hold the property by his attachment.

This state of the case was brought out by the accounting, and what was held by the supreme court in this interlocutory decision and mandate, was based upon the state of the evidence as it was then before the court, prior to the accounting, and is not understood to have been designed or regarded as concluding the fact, except as a ground for ordering the account to be taken. This being so, there is only left to the orator to urge his equitable right to claim any surplus of avails of all the property and securities received by the defendants, after a just and equitable accounting and adjustment between the defendants and the Union Arms Company.

The property having been properly disposed of, and the avails failing to pay the amount of the debt and the just charges of the defendants resting upon it, of course, the defendants cannot be held to the Union Arms Company, or to the orator, for any thing to apply on the orator's judgment against said company.

The object of the bill, in any aspect of it, has, therefore, failed, and it should be dismissed with costs, to be taxed and adjusted in the court of chancery, having regard to the former order of this court in respect to costs.