FAGAN *et al. v.* THOMPSON *et al.*

(*Circuit Court, E. D. Missouri, E. D.* April 9, 1889.)

1. TRUSTS—EXPRESS TRUSTS—RECITALS IN MORTGAGE.

A mortgage was executed to T., which recited that T. had, or was about to, become surety on a certain bond of indemnity conditioned to pay complainants all such sums as they might be compelled to pay as sureties on a bond for the release of mortgagors' steamer, which had been libeled, and provided that upon repayment to T. by mortgagors of any and all sums that he might be required to pay by reason of signing such indemnity bond, the mortgage was to be void. *Held* that, as T. never signed the indemnity bond, the complainants acquired no rights in the mortgaged property by virtue of the mortgage.

2. SAME—CREATION BY ESTOPPEL—REPRESENTATIONS.

The circuit court rendered a decree against the mortgagors and complainants in the case against the steamer, and an arrangement was entered into with T.'s knowledge by which complainants were to become sureties on an appeal-bond on condition that T. should execute a bond of indemnity in their favor against liability both on the appeal-bond and all previous bonds signed by complainants for the mortgagors. Complainants executed the appeal-bond, relying on T.'s representation that the mortgagors had placed real and personal property in his hands "to secure all parties who had signed bonds" on account of the steamer, and on his promise to turn over any portion of such property in trust to secure complainants in case they were not satisfied with his bond. The mortgage in question had been executed, but T. denied any knowledge of it, but shortly afterwards one of the mortgagors conveyed the property to T. The steamer had been transferred to T. to indemnify himself from loss on another bond, and he had agreed after his liability had been discharged to do with it as the mortgagors might direct. *Held,* that T. was estopped from denying that he held the property in trust for complainants, and was bound to treat the steamer as held in pledge for complainants' protection as well as for his own.

3. SAME—STATUTE OF FRAUDS.

The fact that T.'s written representations did not sufficiently identify the lands to satisfy the statute of frauds does not avoid the estoppel, it not appearing that T. acquired any real estate from the source represented other than that conveyed by the deed.

4. SAME—EXTENT OF TRUST.

T., in his letter containing the representation in regard to the property, also said: "This property I hold in trust for the benefit of all who signed, not for myself alone." *Held,* that this clearly implied that T. was a beneficiary in the trust, and that he was entitled to participate ratably in the fund realized from the sale of the realty.

5. PLEDGE—ACCOUNTING BY PLEDGEE.

After the steamer had been turned over to T. he transferred it to a corporation in exchange for its entire capital stock, by which the steamer was employed under the captaincy of one of the mortgagors. T. advanced large sums from time to time to aid in running the steamer, but debts accumulated for expenses, repairs, and insurance, and she was finally sold under judicial

decree, T. realizing nothing from it. *Held* that, as T.'s conduct appeared to be neither reckless, negligent, nor improvident, and as the complainants were fully aware of the manner in which the steamer was employed, and made no objection, T. was not accountable for its value.

6. SAME.

The steamer was sold under legal process at the solicitation of mortgagors. T. consented to purchase, and did so, advancing the money therefor, and agreeing to convey it to whomsoever the mortgagors might direct upon repayment of the purchase money, he in the mean time to retain the steamer solely as security. While it was so held it was libeled for a collision. *Held* that, as between T. and the mortgagors and their creditors, he had a lien on the steamer for whatever advances he was compelled to make, or liabilities he assumed in order to secure its release from the seizure.

In Equity.   Bill to subject fund to a trust.

The bill of complaint in this case charged, in substance, that on December 1, 1878, Mary E. Stein, now a widow, but then the wife of Albert Stein, was the nominal owner of the steam-boat Charles Morgan, but that the same was being used and operated for the benefit of herself and husband, and her son, Harry W. Stein, the two latter persons being respectively master and clerk of the steamer. That while said steam-boat was so used and operated, she was libeled, and seized at the port of New Orleans, on December 7, 1878, by reason of a collision with the steamer Cotton Valley, and that complainants were thereafter, in December, 1878, induced to become sureties on a bond signed by Mary E. and Albert Stein, as principals, to obtain the release of the steamer Morgan, through representations made by Albert and Harry W. Stein that they would procure defendant William H. Thompson to indemnify and hold the complainants harmless from the liability so assumed. That Harry W. Stein was the owner of certain valuable real estate in Cincinnati, Ohio, that had been theretofore conveyed to him by his father, Albert Stein, without consideration; and that, while said suit was pending in the district court of the United States for the district of Louisiana, defendant Harry W. Stein, on July 22, 1881, executed and placed on record in Cincinnati, Ohio, a mortgage on said real estate, which purported to be given to secure Thompson, as mortgagee, for having or being about to indemnify the complainants against the liability by them assumed on the release bond aforesaid, and which also purported to be given to secure Thompson against liability for having himself signed a bond to secure the release of the steamer Morgan in certain proceedings begun against the steamer in the United States district court for the district of Kentucky.   The bill alleged that shortly after the steamer Morgan was released at New Orleans in December, 1878, she proceeded to Cincinnati, Ohio, and that the defendants caused her to be there libeled on another demand in the United States district court, and to be speedily sold under an order of court on December 28, 1878, and that at such sale the steamer was purchased by defendant Thompson for about $15,-000; that such purchase was made by Thompson under an agreement with Mary E., Albert, and Harry W. Stein that the purchase money was to be refunded to him; that it was so refunded; that in point of fact the said sale at Cincinnati was fraudulent and collusive, and de-

signed to hinder and delay the creditors of Albert, Mary E., and Harry W. Stein ; that about the same time the Steins conveyed to Thompson two barges, and an interest in a wharf-boat in the city of Cincinnati, which conveyance was also alleged to be fraudulent and collusive. The bill averred that after Thompson bought the steamer Morgan as aforesaid, and while the steamer stood enrolled in his name as owner, she collided with the steamer Charles W. Cannon, on account of which proceedings were begun against the Morgan on April 30, 1880, in the district court of the United States for the district of Kentucky, and that the release bond signed by Thompson in that proceeding, and referred to in the mortgage above mentioned, was in reality a bond signed by Thompson as principal, and not as surety for either of his co-defendants. The bill averred that, after the transfer of the steamer to him, Thompson sold• her to the Morgan Transportation Company for the price of $20,000 in full-paid stock ; that the steamer was then worth $27,000, and that Thompson has not accounted for the stock ; that defendant Mary E. Stein, about the time the mortgage aforesaid was executed, also transferred to Thompson four shares of stock of the Missouri Lead & Oil Company, of the value of $5,000 ; that Thompson paid nothing for the stock, and that the transfer to him was fraudulent and collusive ; that on September 11, 1883, defendant Harry W. Stein, for an expressed consideration of $3,000, but in reality for no consideration whatever, conveyed to Thompson the Cincinnati real estate which he had previously conveyed to him by way of mortgage on July 22, 1881, said conveyance being made and accepted subject to said mortgage, and that said realty was at the time worth $20,000.

The bill then averred that the suit against the steamer Morgan first above mentioned was prosecuted in the United States district and circuit court for the district of Louisiana, with the result that on March 18, 1882, a decree was rendered against the complainants as sureties on the release bond, by the United States circuit court, for the sum of $15,-074.60; that thereupon defendants Mary E. and Harry W. Stein applied to complainants to become sureties on an additional bond, to appeal the cause to the supreme court of the United States, representing at the time that defendant Thompson had agreed to execute an indemnity bond in their favor in case complainants signed such appeal-bond, and that they had placed in his (Thompson's) hands ample property to secure him for so doing; that Thompson himself also wrote to complainants' attorney, urging them to sign such appeal-bond, and assuring them that he had received from the Steins' property sufficient to indemnify complainants from all liability or loss which might result to them from having signed any bonds in said cause theretofore, or by reason of their signing the appeal-bond, and that he held said property so received in trust to secure all who had or did sign bonds for said steamer Morgan; that complainants, relying upon the representations so made by Thompson, eventually became sureties on said appeal-bond; that an appeal was duly prosecuted to the supreme court of the United States in said cause, which resulted in a decree of affirmance on May 4, 1885, whereby complainants

were condemned to pay and did pay the sum originally decreed to be paid by the United States circuit court, together with interest thereon at 5 per cent. per annum from December 1, 1878, (*The Charles Morgan* v. *Kouns*, 115 U. S. 69, 5 Sup. Ct. Rep. 1172;) that Albert Stein died insolvent, and that Mary E. and Harry W. Stein are now without means and insolvent. In view of the premises the bill charged that the property heretofore mentioned was placed in Thompson's hands as a trustee, and that he holds a large amount of valuable real and personal property and money, which was placed in his hands by the Steins to secure him for indemnifying the complainants from any and all loss as sureties, and which he received in trust for that purpose. The bill prayed that Thompson be compelled to account for such property; that he be decreed to hold all such property charged with a trust in complainants' favor, and for general relief. The answer to the bill denied all the charges of fraud and collusion contained therein. In substance, it denied that Thompson ever received from the Steins any property whatsoever in trust to indemnify the complainants, or that any property by him held was chargeable with a trust in favor of complainants. It admitted that a mortgage of the tenor mentioned in the bill, on real estate situated in Cincinnati, Ohio, was executed by Harry W. Stein, and that it was placed on record without his (Stein's) knowledge, but averred that said mortgage was never delivered to or accepted by Thompson, and that the latter had no knowledge of the existence of the mortgage for several years thereafter, nor until it was discovered among the papers of Albert Stein. It further averred that the subsequent conveyance on September 11, 1883, of the real estate mentioned in said mortgage, by Harry W. Stein to Thompson, was made to reimburse the latter for money loaned to Harry Stein, and to make good the loss which Thompson had sustained by executing a release bond for and in behalf of Mary E. Stein, when the steamer Morgan was libeled at the instance of the owners of the steamer Charles W. Cannon, in the United States district court of Kentucky.

*Given Campbell*, for complainants.

*James Taussig*, for respondents.

THAYER, J., (*after stating the issues as above.*) From what has been said concerning the allegations of the bill it is evident that it was framed with a view of establishing a trust, and obtaining an account and administration of the trust property. A certain class of averments tend to show that the trust sought to be enforced is a resulting trust, arising out of a fraudulent conveyance of property by Mary E., Albert, and Harry W. Stein to the defendant Thompson. Another class of averments charge, in effect, that the defendant Thompson holds certain property upon an express trust created for complainants' benefit as sureties of Mrs. Stein, or at least that defendant is estopped to deny the existence of such a trust. I have considered the case in both aspects, and accordingly announce the following conclusions on questions both of law and fact:

*First.* The Cincinnati real estate alluded to in the bill was conveyed to

Harry W. Stein by Albert Stein in the year 1877. The evidence in the case does not show that that conveyance was without consideration and for that reason fraudulent. On the contrary, it tends to show that a valuable (if not an adequate) consideration was paid for that conveyance. But, even if such was not the fact, Capt. Albert Stein appears to have been in a condition at that time to have made a valid gift of the property to his son. Furthermore, there is no sufficient evidence affecting Thompson with notice of the invalidity of that conveyance, if it was invalid. For these reasons that averment of the bill of complaint must be ignored. Neither does the testimony in the case show that Mary E. Stein on December 1, 1878, was merely the nominal owner of the steamer Charles Morgan, as the bill avers. For all the purposes of this case it must be assumed that she was the real owner. The evidence does not show that the sale and transfer of said steamer to defendant Thompson, at Cincinnati, Ohio, on December 28, 1878, or that the sale and transfer to him of the two barges and an interest in a wharf-boat, or that the transfer to him of four shares of stock in the Missouri Lead & Oil Company were either of them fraudulent and collusive, so far as defendant Thompson was concerned. It is unnecessary to determine what prompted Mr. and Mrs. Stein to suffer the steamer Morgan to be sold under legal process at that time and place. It is evident that the complainants, or their attorney and representative, Mr. Rice, who was present on that occasion, was fully apprised of their purpose and assented to the sale, even if he did not himself advise and recommend it, and that he and his clients assented to the purchase made by Mr. Thompson. Complainants are in no position, therefore, to complain of that transaction. The facts pertaining to the purchase, as found by the court, are that defendant Thompson was urgently solicited by Mr. and Mrs. Stein, who were his relatives, to purchase the steamer at the marshal's sale, and he consented to do so, and to advance the money requisite for that purpose, which he did, the sum advanced being $16,000. He further agreed to reconvey the steamer to Mrs. Stein, or to whomsoever she might direct, when the purchase money advanced by him had been repaid; and in the mean time he was to retain the title to the steamer solely as security for such repayment. Pending the repayment of the purchase money so advanced, it was no doubt understood by all parties, including the complainants, that the Steins were to have full control and management of the steamer, and the benefit of all her earnings. Between December 28, 1878, and February 3, 1880, Thompson was repaid the amount of his advances. The four shares of stock in the Missouri Lead & Oil Company were transferred to him during that period in part payment, at an agreed valuation of $4,000. From February 3, 1880, to May 6, 1880, on which latter date the steamer Morgan was reconveyed to Mrs. Stein, defendant Thompson held the legal title to the steamer in trust for her, or as her bailee, and had no other interest therein. It was during that period, (in the latter part of April, 1880,) and while the Steins had control of the steamer, that the second collision with the Cannon occurred, which gave rise to the suit in Kentucky. If any barges and an interest in any wharf-boat were ever conveyed to

Thompson, they were so conveyed originally, as additional security for the repayment of the money advanced by him to purchase the steamer at the marshal's sale above alluded to. The barges and the interest in the wharf-boat eventually appear to have become valueless, and may be dismissed from the controversy without further remark. The allegation in the bill that Harry W. Stein conveyed to his co-defendant Thompson, on September 11, 1883, real estate located in Cincinnati, Ohio, of the value of $20,000, for an expressed consideration of $3,000, but in reality for no consideration, is not established by the evidence. Such a conveyance was made for an expressed consideration of $3,000, but the evidence shows to my satisfaction that Mr. Thompson had made advances to that amount to Harry W. Stein and to Mrs. Stein, which the conveyance, as between the grantor and the grantee, was intended to repay. That conveyance stands upon a sufficient consideration to render it valid, and it certainly cannot be attacked as voluntary by these complainants. Whether that conveyance inured to the benefit of the complainants upon other grounds is a question to be hereafter considered. From what has been said, therefore, it appears that, in so far as the bill seeks to charge defendant Thompson with the possession of property, real or personal, received from either Mary E., Albert, or Harry W. Stein, under such circumstances that a trust results by operation of law in favor of the complainants as creditors of the Steins, or either of them, the bill cannot be maintained.

*Second.* The answer denies that the mortgage of July 22, 1881, executed by Harry W. Stein, was ever delivered to or accepted by Thompson, or that it was placed on record with Stein's knowledge. The issue so tendered, however, must be found against the defendants. The deed of September 11, 1883, also executed by Harry W. Stein, refers to the mortgage of July 22, 1881, and professes to convey the lands therein described, subject to that conveyance. The execution of that deed by the mortgagor, and the acceptance thereof by the mortgagee, with the recital aforesaid, is a sufficient recognition of the existence of the mortgage as a subsisting incumbrance, and is sufficient proof of the delivery of the same by Harry W. Stein, and of the acceptance thereof by defendant Thompson. But, conceding such to be the law, it must nevertheless be held that the mortgage will not warrant the court in granting relief under the averments of the bill. The mortgage did not create a trust in any lands in favor of the complainants. The mortgage was given solely to secure Thompson from liability on account of his having given, or being about to give, the complainants an indemnity bond, and also to secure him on account of his having become surety on a release bond in the *Cannon Case*, pending in the United States district court for the state of Kentucky. The mortgage recites, in effect, that "whereas, William H. Thompson has, or is about to, become surety on a certain bond of indemnity," conditioned to pay complainants all such sums as they may be compelled to pay as sureties on the release bond given at New Orleans in the *Cotton Valley Case*, "now, if Mary Stein shall pay or cause to be paid to Thompson, any and all sums that he shall pay or be required to

pay by reason" of his signing the indemnity bond in favor of complainants, or in consequence of his becoming surety on the release bond in the *Cannon Case,* then the mortgage shall become void. In point of fact Thompson never signed a bond of indemnity in favor of complainants, such as the mortgage recites, or any other bond, in their favor, and therefore acquired no right to hold the mortgaged property for his indemnity. Under such circumstances, it goes without saying that the complainants acquired no rights in or to the mortgaged property by virtue of the mortgage.

*Third.* The next and most important question in the case is whether the evidence is sufficient to establish an express trust, and involved in this inquiry is the further question whether defendant Thompson is not estopped to deny that he holds certain property in trust to indemnify the complainants. The facts bearing on these issues, as developed by the testimony and found by the court, are as follows: After the collision with the steamer Cannon occurred, and after Thompson as enrolled owner had signed a bond as principal to secure the release of the steamer Morgan from the seizure made in the district of Kentucky on account of that collision, he reconveyed the Morgan to Mrs. Stein, by bill of sale dated May 6, 1880. That conveyance was obviously made by Mr. Thompson to relieve himself from personal liability as ostensible owner, for future damage that might be done by the steamer, and from liabilities that she might incur. At the date of that conveyance proceedings were pending against the Morgan in the districts of Louisiana and Kentucky, and release bonds had been given in each case. It is evident that at that time it was not supposed that either suit was well founded, (particularly the *Cannon Suit,*) or that either was liable to result in a decree in favor of libelants. On May 3, 1881, however, a decree was entered in favor of libelants in the *Cannon Case,* in the sum of about $14,-000, against Mr. Thompson and his sureties on the release bond, and on the 15th of June following a decree was rendered in the United States district court for the district of Louisiana in favor of libelants in the *Cotton Valley Case* against Mr. and Mrs. Stein and their sureties, these complainants, in the sum of $13,698. From the decree in the latter case an appeal was taken by Mrs. Stein and her husband to the United States circuit court. On July 15, 1881, following the two decrees last mentioned, Mrs. Stein reconveyed the steamer Morgan to defendant Thompson. The bill of sale of the steamer made on that day, recites a consideration of $10,000, but it is conceded that no consideration was paid for that conveyance. The evidence in the case satisfies me that the bill of sale in question, at the time it was executed, was made by way of pledge for the sole purpose of indemnifying Thompson against the decree in the *Cannon Case* that had been rendered against him on the preceding 3d of May. The evidence does not show, in my opinion, that the defendant, when he accepted the bill of sale of the steamer Morgan, on or about July 15, 1881, either agreed to hold the steamer in trust to indemnify the complainants as sureties on the release bond in the *Cotton Valley Case,* or in trust to indemnify both himself and the complainants.

The defendant did agree, no doubt, with Mrs. Stein, to transfer, or do with the steamer as she might direct, after his liability on the release bond in the *Cannon Case* had been discharged without outlay on his part; but that an express trust was created at that time in favor of complainants is not probable, and I do not so find. From and after July 15, 1881, the steamer remained, as before, under the charge and control of the Steins. On March 15, 1882, a decree was rendered by the United States circuit court in the *Cotton Valley Case* in favor of libelants and against Mr. and Mrs. Stein, and these complainants as sureties, in the sum of $15,074. The evidence shows that an arrangement was then made between Mr. and Mrs. Stein and Harry W. Stien and the complainants, which was made known to defendant Thompson, and was assented to by him, to the effect that an appeal should be taken in the *Cotton Valley Case* to the United States supreme court; that complainants should become sureties for the Steins on an additional appeal bond in the sum of $4,000; and that defendant Thompson should execute a bond in favor of complainants, to indemnify them against liability both on said appeal-bond and all previous bonds that they had signed as sureties for Mr. and Mrs. Stein. Thereafter a controversy arose between complainants and Thompson as to the form of the indemnity bond that should be executed by him. The details of that controversy, and the representations made by Mr. Thompson, which are relied upon to establish a trust, and also to create an estoppel, will be best shown by the letters on the subject which passed between Mr. Thompson and Mr. Rice, who appears to have been acting in the matter as attorney for complainants. The letters are as follows:

"APRIL 7th,    2.

"*W. H. Thompson, Esq., St. Louis, Mo.*—DEAR SIR: At time of acknowledging receipt of bond, a few days since, I had not read it with care. But on doing so, and on exhibiting to the gentlemen in interest, they are dissatisfied with it. I drew up a bond in accordance with an understanding which was mutual to the gentlemen and to Captain Stein, and which was represented in the conditions. The bond was intended to cover *all* the liability of the persons, Wood, Leathers, Martin, and Fagan, who had signed the release bond, and the bond for appeal to the circuit court. Captain Stein explained that you would understand this, and that he or Mrs. Stein had placed securities in your hands to protect you in signing such bond. The bond returned has reference only to the bond of $4,000 *yet to be given,* to procure an appeal to the sup. court of the U. S.,—very different, as you will see, from what was the intention when the bond prepared by me was drawn up. The gentlemen will hesitate to sign a further bond, before they are satisfied. I shall to-day return both bonds to Captain Stein at Cinn. Very respectfully,

"CHAS. S. RICE."

"ST. LOUIS, April 10th, 1882.

"*Chas. S. Rice, Esqr., New Orleans, La.*—DEAR SIR: I am in receipt of your favor of the 7th, and would say in reply that the intention of the bond was to cover all liability that existed by the signing of the 'release bond,' the bond of appeal to the U. S. circuit court, and also to the U. S. supreme court. The bond you sent only covered the two first items, and you stated in yours of March 25th as follows: 'It explains itself, except that it is proposed to take the case to the U. S. supreme court on appeal.' It was this exception

that I wanted inserted in the bond, and I cannot see why you should object, or why I should sign bond, unless it is inserted. My understanding of the situation is that the parties on the bond objected to any further liability, unless they could have security, which, under the circumstances is only prudent in them, and in order to obtain this security the dispatch was sent to me by Harry Stein. It would hardly be possible for me to understand what you and Captain Stein were agreed about, or the conditions which were or were not to be inserted in the bond. On the receipt of the bond, as I wrote you, I went to see Capt. Stein, to ascertain the condition of affairs, and he was under the impression that the bond did provide for appeal to U. S. supreme court. Now, in regard to the securities you mention as being placed in my hands, would say that Capt. and Mrs. Stein did place in my hands property, real and personal, to secure all parties who had signed bonds on account of the Morgan. This property I hold in trust for the benefit of *all* who signed; not for myself alone. If my signature as trustee only is wanted, then it would hardly be proper for me to make conditions. But when I sign for myself it is only fair that I should know the conditions and responsibilities which I assume. Allow me, therefore, to repeat what I stated in mine of the 1st: 'The object being to secure all parties, if not satisfactory, will be ready to consent so as to cover all points.' Now, if you will draw up a bond to cover the liability of the parties for signing 'bond of release, bond of appeal to U. S. circuit court,' and bond of appeal to U. S. supreme court, subject to the decision of the U. S. supreme court, etc.,—in other words, I am willing to secure parties in case the suit is finally decided against the Morgan in the courts from all liability that would accrue against them from having signed *any or all bonds*, and only ask you to put it in such shape that the bond will 'explain itself,' without any exceptions. If this is satisfactory, please let me know. Yours respectfully,                                    W. H. THOMPSON."

"NEW ORLEANS, LA., April 14th, 1882.

"*To W. H. Thompson, St. L.:* The bond I prepared I have again carefully examined. It seems to me to be exact. Stein has it.

"CHAS. S. RICE."

"ST. LOUIS, April 15th, 1882.

"*Chas. S. Rice, Esqr., New Orleans*—DEAR SIR: Your telegram came duly to hand, and would say in reply that I cannot sign the bond you prepared. If the gentlemen *only desire to be secured,* I cannot see why they should object to provide in the bond for the final adjudication of the case. I cannot add anything to what I wrote you on the 10th, except to say that, if the parties are not satisfied with my personal bond, if they prefer, I will turn over to any person who may be selected as trustee, any portion of the property conveyed to me by Stein and his wife, and which I hold as trustee to secure all parties who had signed bonds for the Morgan. I am perfectly willing that any part of it may be so transferred and held subject to the final decision in the case. I would only add that any bond that may be drawn shall have *all* the conditions plainly stated, and the rights of both parties properly defined. The bond you sent provides for only one, and I cannot think the gentlemen interested would require any such conditions for their protection as is contained therein. Yours, respectfully,                                    W. H. THOMPSON."

"MAY 9th.

" *W. H. Thompson, Esq., St. Louis, Mo.*—DEAR SIR: I remitted, at request, yesterday a portion, and to-day the balance, of the papers in the Kouns-Morgan matter to Messrs. Lincoln, Stephens & Slattery. I cannot conceive the reason of the last bond prepared not being signed, if it was intended to furnish the indemnity promised. I confess myself unable to understand what

are the grounds of your objections. I have urged the gentlemen, through Mr. Ward, to complete bond for appeal to the supreme court without allowing more delay, which I have been powerless to prevent. * * * The decree was rendered March 18th. The law allows sixty days for filing bond,— if the delay to appeal is to operate as a *supersedeas.* Very respectfully,

"CHAS. S. RICE."

"ST. LOUIS, May 12th, 1882.

"*Chas. S. Rice, Esqr., New Orleans*—DR. SIR: I am in receipt of your favor of the ninth, and note contents. Would say that in relation to bond prepared the same objections apply as the first one, and are fully explained in my former letters. The question of whether 'it was intended to furnish the indemnity promised,' would seem to me to be already settled in those same letters, in addition to the bond, which I suppose is in your possession. If there was any doubt about what the bond was intended to cover, it seems to me that my letters, written after signing said bond, would show how I understood it at time. In regard to the delay, would say that when first bond was received I gave it prompt attention, and had bond forwarded promptly, and received your account of the same. Some time afterwards you returned the bonds with your objections. I wrote you at once, covering all points of dispute, and wired you that I would have bond prepared in accordance with conditions stated in my letter. You declined, and insisted on the first bond, which I had already declined to sign. You then wired for bonds to be returned, which was promptly done. Over two weeks elapsed from that time before you prepared the last one, (at least before I heard of it,) and, when I declined to sign the last one, I proposed, if you would wire me, I would have bond furnished. The delay is, I think, not chargeable to me. However, I think it would be better to get matters arranged, and afterwards we can see who was to blame. You can say to the gentlemen that I am willing to secure them just as I agreed to, and, if the bond they have is not satisfactory, will have one prepared, and forward for their inspection, and, if satisfactory to them, will get Stein and wife to sign, and I will sign and forward as promptly as possible. In this way, it seems to me, we will reach a settlement sooner, and avoid what might lead to an extended correspondence. I will glad if you will wire me (c. o. d.) on receipt of this, whether appeal is or will be perfected, so I will know whether to arrange for bond in case the gentlemen decline. Allow me to say further that I regret very much if we misunderstood each other, and can say that in all my objections none were made for the purpose of avoiding the responsibility. I agreed to secure the gentlemen, and propose to do so. *I think* you put conditions in the bonds that you should not have done if the object was only security. I think a bond with the objectionable clause left out would be just as good, and I do not want the gentlemen to accept anything that does not cover all points. Yours, respectfully,

"W. H. THOMPSON."

The result of the controversy was that an indemnity bond was not executed. Before the time expired, however, for perfecting an appeal, the same was duly taken, and complainants became sureties on the appealbond. I think the weight of testimony shows, and I accordingly find, that complainants were induced to sign the appeal-bond mainly by the representations contained in Thompson's letters, to the effect that the Steins had placed real and personal property in his hands "to secure all parties who had signed bonds on account of the Morgan," and by his promise to turn over any portion of such property to a trustee to secure the complainants, if they were not satisfied with his personal bond. I

consider it highly probable that positive statements of that character may have induced, and did induce, the complainants to sign the appeal-bond, although the promised indemnity bond had not been and was not executed. It is also highly probable, and I accordingly find, that on at least one occasion after the appeal to the United States supreme court had been taken Mr. Thompson made verbal representations to Burrus D. Woods, one of the complainants, substantially the same as those contained in the Rice letters. Mr. Thompson admits that he met Woods in Cincinnati late in May, 1882, and had an extended conversation with him about signing an indemnity bond then, and that he told him on that occasion that the complainants could have the steamer Morgan then, if they wanted her; that the steamer had been incorporated; but that complainants could have her, "to see that she was not run away with." Concerning the oral representations said to have been made to Mr. Woods, it is proper to say in this connection that, inasmuch as verbal declarations will not suffice to impress a trust on real property, and as all of the alleged interviews with Thompson to which Mr. Woods alludes, in my opinion, occurred, if at all, after the appeal was taken, I am not disposed to regard any of them except the one that took place in Cincinnati on the occasion last indicated, as of much importance. At the time the foregoing representations were made the title to the steamer Morgan was vested in the defendant by virtue of the bill of sale of July 15, 1881. The mortgage on real estate in Cincinnati, Ohio, executed by Harry W. Stein, and heretofore alluded to, was also on record, but Mr. Thompson claims, and such contention is probably correct, that he had at the time no knowledge of the existence of the mortgage. So far as the evidence shows, he held no other property, real or personal, belonging to the Steins, or in which they had any interest. Subsequently, however, on September 11, 1883, Harry W. Stein made an absolute conveyance of the Cincinnati real estate (the same before mentioned) to Mr. Thompson; the bulk of which he still holds. I think it proper to say (although the fact is not every material in this proceeding) that the representations made in the letters above quoted were not made, in my opinion, with an actual intent to deceive the complainants to their prejudice. Relying confidently upon what had been promised by the Steins to be done, in case he signed the bond of indemnity, Mr. Thompson, as I think, represented that to have been already done, which he had no doubt would be done, but in reality had only been promised.

On the basis of fact above outlined I proceed now to state the conclusions I have formed. I am of the opinion that the defendant Thompson is estopped from denying that he holds the real estate conveyed to him on September 11, 1883, for the benefit of all who signed bonds for Mr. and Mrs. Stein, including the complainants. I also conclude that from and after the time complainants acted on the representations aforesaid he became bound to treat the steamer Morgan as held in pledge for the protection of the complainants as well as for his own protection. If the complainants had not acted on the representations made to them in the letters above quoted,—in other words, if it was a simple question of

impressing a trust on realty by means of written memoranda,—it may be that the letters would be inadequate, because they do not sufficiently identify the lands to which the trust relates, or refer to any other written memorandum which does serve to identify them. The rule is no doubt that memoranda or writings declaratory of a trust in lands, to satisfy the statute of frauds, must identify the subject-matter of the trust with reasonable certainty, as well as explain the object of the trust, so that it may be enforced. *Forster* v. *Hale*, 3 Ves. 708; *Hutchinson* v. *Tindall*, 3 N. J. Eq. 357; *Dillaye* v. *Greenough*, 45 N. Y. 438; Brown, St. Frauds, §§ 97 and 108, and cases cited. Bisp. Eq. 74. But, even conceding the insufficiency of the letters, (regarded merely as a declaration of a trust affecting lands,) it does not follow that defendant can avoid the estoppel raised by his letters, merely because he used general language, and did not clearly describe the real estate referred to. Although the location of the property is not mentioned, defendant cannot be permitted to gainsay the cardinal fact stated in his letters that real property had been placed in his hands by the Steins "in trust for all who had signed bonds," now that complainants have acted to their prejudice on the faith of such representation. And, inasmuch as Mr. Thompson does not appear to have acquired any real estate from the source represented, other than that deeded to him in September, 1883, which he now holds, it must be presumed that that was the property intended, and the property in question must be treated, according to the representation, as held in trust for the purpose by him stated.

It is contended by counsel, that the defendant ought not to be held liable on the ground of estoppel, because the complainants did not incur any additional liability by signing the appeal-bond to the supreme court of the United States, or place themselves in any worse position than they had before occupied; in short, that they were not prejudiced by the representations made, and that one necessary element is wanting to create an estoppel. I have not been able to concur in that view of the case. Complainants certainly incurred an additional liability by signing a new bond, but in addition to that fact I think it highly probable that if they had not signed the appeal-bond, and had suffered the decree of the circuit court to be enforced, the principals in the release bond (Mr. and Mrs. Stein) would at that time have protected them in a large measure, if not entirely, from their liability. When the decree was affirmed three years later, in 1885, the condition of affairs had materially changed. I have no doubt that complainants were prejudiced by acting on the representation that property was held in trust for their benefit, and that they are well entitled to insist on the estoppel.

On the part of the complainants it is insisted that they are exclusively entitled to the proceeds of whatever property, real or personal, originally received from the Steins, the defendant may be charged with in this proceeding, and that it should be administered accordingly. It is contended that the defendant ought not to participate in the distribution of the proceeds of any property found to be in his hands, notwithstanding the fact that he was compelled to pay $14,855.99,—the amount of

the decree against the steamer Morgan in the *Cannon Case*,—which amount has not been refunded to him. It is claimed, as I understand, that this was Thompson's individual debt, and that the Steins were in no wise liable to him for the expenditure. The court is compelled to dissent from that view of the law. The defendant's liability must be measured by the representations he appears to have made to the complainants. He is entitled to show the true relation that he sustained to the Steins, and to have his rights adjudicated accordingly, in so far as he may be able to do so without contradicting the representations made to complainants. Now, the defendant did not represent that the real and personal property in his hands was held by him exclusively for the benefit of the complainants, or that it was sufficient in amount to fully protect them from loss. On the contrary, the representation was that the property was held "to secure all parties who had signed bonds on account of the Morgan," and the sentence following that statement in the letter of April 10, 1882, "this property I hold in trust for the benefit of all who signed, not for myself alone," clearly implied that the defendant himself was one of the beneficiaries in the alleged trust. It must be also borne in mind that at the time the collision occurred between the steamers Morgan and Cannon the legal title only of the Morgan was vested in Thompson. As between himself and Mrs. Stein, she was unquestionably the beneficial owner. Thompson did not even have possession and control of the steamer, the Steins being then in possession. Under the circumstances, I think it clear that, as between himself and Mrs Stein and her creditors, Mr. Thompson had a lien on the steamer for whatever he might be compelled to pay on account of the collision, or for whatever liability he assumed to secure her release from seizure. When he transferred the steamer to Mrs. Stein on May 6, 1880, I have no doubt that it was understood between him and the Steins that they would protect him from that liability. His claim against Mrs. Stein for moneys expended in satisfying the decree in the *Cannon Case*, appears to me, therefore, to be equally as meritorious as the claim of the complainants for moneys expended in satisfying the decree in the *Cotton Valley Case*. Such being the fact, he should share ratably with the complainants in whatever fund is realized from the sale of the Cincinnati realty. That property was conveyed to him, to reimburse him, so far as it would extend, for his outlays in the *Cannon Case*, and for money loaned to Harry W. Stein, in whom the title to the property was vested. If, then, the defendant is to be charged on the ground of estoppel as holding that property in trust for the benefit of all who signed bonds on account of the Morgan, I can conceive of no reason why he should not participate ratably in the distribution of the fund in question, to the extent that his outlays as a bondsman remain unpaid.

*Fourth.* A further question concerning the use and final disposition of the steamer Morgan, and defendant's accountability therefor, at this point demands notice. In April, 1882, a corporation was organized under the laws of Kentucky, styled the "Morgan Transportation Company," to operate the Morgan. Thompson transferred the steamer to the corpora-

tion on April 18, 1882, in exchange for its entire capital stock. Thereafter the steamer was employed from time to time in the Cincinnati and New Orleans trade, under the captaincy of Albert or Harry W. Stein. Upon the whole, the trade in which she was employed does not appear to have been profitable, although some trips were remunerative. Defendant Thompson appears to have advanced considerable sums of money from time to time to aid in running the steamer, but debts accumulated for operating expenses, repairs, and insurance, and she was eventually libeled, and sold under judicial decree in March, 1884. Nothing was realized by the defendant from such sale. Now, conceding that defendant must be regarded as holding the steamer for the joint benefit of himself and complainants from and after his representations to that effect in the spring of 1882, a question arises whether he should be charged with the value of the steamer at any time, and in what sum. For various reasons I am of the opinion that this question should be answered in the negative. In the first place, I think that the defendant was justified in making efforts to keep the steamer employed, considering the character of the property, the time that would probably elapse before the litigation terminated, the expense of keeping such property idle, and the probable depreciation in the value of the same in the mean time. Considerations of that sort, in my opinion, justified the defendant in incurring some risks in the effort to employ the steamer profitably that would not have been justified if the property had been of a different character. The same rule ought not to be invoked against a person who holds a steam-boat in pledge under the circumstances disclosed by this case, that would properly be applied as against a person holding bonds, stocks, or other similar securities in pledge. In the second place, the evidence does not satisfy the court that the management of the steamer during the period now in question was either reckless, negligent, or improvident. She was employed in the same trade in which she had formerly been employed, and for which she seems to have been built by Capt. Albert Stein. The fact that she lost money appears to have been due to competition between steam-boats and railroads, and to a general decline in freight rates, and to a falling off in the demand for transportation by water, and other causes, that could not be guarded against, rather than to extravagance in management. Furthermore, during the period in question, from 1882 to 1884, the complainants were fully aware of the manner in which the steamer was employed, and neither of them suggested a change of policy, or expressed any dissent, although two of them were practical steam-boat men. Some of them dealt with the steamer during the entire period, and furnished her with supplies of various kinds. They were as deeply concerned in the property, and in whatever efforts were made to render it productive, as the defendant. From and after April, 1882, complainants probably knew what other property of the Steins was available for their security. It is obvious, I think, that they were well satisfied to have the steamer run whenever, in the opinion of Capt. Albert or Harry W. Stein, there was a fair chance of making a profitable trip. At all events, from the fact that none of the

complainants objected to the use made of the steamer during the years 1882 and 1883, it is fair to infer that she was employed in a manner that at the time met with their approval. It also appears, as before stated, and the fact is not denied, that in May, 1882, Mr. Thompson offered to turn the steamer over to Mr. Woods, and that he either declined to take her, or at least did not act on the offer. In view of all these facts, the court concludes that the defendant ought not to be held accountable for the value of the steamer.

At the same time I think the defendant should not be allowed to bring into the account, as against the complainants, the various sums aggregating about $6,605.50, which he appears to have advanced to Mrs. Stein and Harry W. Stein and others between May 23, 1883, and November 10, 1884, although a large portion of that money may have been spent by the Steins in running the steamer. The view that the court takes of the case does not necessitate a reference of the same to a master. The facts already established by the testimony are sufficient to formulate a decree such as I propose to now enter. The decree will adjudge that all the real estate conveyed to the defendant by the deed of September 11, 1883, which has not been disposed of, is held in trust by him for the benefit of himself, and these defendants, and it will direct that a sale of the same be made by the defendant on such terms, and for such prices, as the defendant and complainants may approve, or, in case of a disagreement between them, as this court may approve, and that the fund be brought into this court for final distribution. The court finds the debt due to the complainants from Mrs. Stein to be $21,211.28, with interest to be computed thereon at 6 per cent. per annum, from August 15, 1885, to this date. It ascertains the amount due to the defendant Thompson to be $14,855.99, on which interest is to be likewise computed from April 18, 1885, to this date. Both of these debts will participate ratably in the fund realized for final distribution. It appears that since September 11, 1883, defendant has sold certain of the real estate, and has realized therefor $3,963.64, and that he has expended, in paying mortgages and taxes on the property, the sum of $4,675.71, leaving the property indebted to him in the sum of $712.07, for which expenditure he is entitled to be reimbursed in full out of the proceeds of sale. The costs of this suit up to this date will be taxed against the defendants. A decree will be entered in accordance with the foregoing directions.