Hyde, Respondent, vs. German National Bank, imp.,
Appellant.

*May 15 — September 23, 1902.*

*Contracts: Collateral security: Parol evidence: Logs and lumber:
Liens: Priority: Advances: Accounting: Foreign statutes: Pre-
sumption.*

1. A writing executed by a bank, stating that certain contracts had
   been left with it as collateral for notes of the pledgor and that
   upon payment of the notes the contracts were to be returned,
   cannot be varied or contradicted by oral evidence that the agree-
   ment was that the contracts were to be held as security for
   other debts also.
2. Plaintiff, who had contracted for the purchase of certain stump-
   age, sold a portion thereof to the P. L. Co. by contract, retaining
   a lien for the entire purchase price. The P. L. Co. assigned its
   contract to the defendant bank as collateral security for certain
   debts and for advances to be made by the bank. Afterwards
   plaintiff assigned his contracts, both of purchase and sale of the
   stumpage, to the bank as collateral security for his notes; and
   later the bank became subrogated to the rights of the original
   vendor under plaintiff's contract of purchase. With knowledge
   that the P. L. Co. was conducting the business of cutting and
   manufacturing the timber in a reckless and extravagant man-
   ner, the bank continued to make advances, without assuming
   control of the property and without notifying plaintiff of any in-
   tention to hold such advances as paramount to his claim against
   the company for the purchase price; but the bank did take pos-
   session of a quantity of lumber and sell it, retaining the pro-
   ceeds, which exceeded in amount plaintiff's notes secured by the
   pledge. Plaintiff sued to recover his share of such proceeds
   over the amount of his notes. *Held,* that while the bank as
   pledgee was entitled to be reimbursed for all payments made to
   preserve the property (including insurance) or protect it from
   liens, it was not entitled, as against plaintiff's claim, to be re-
   paid for advances made to the P. L. Co. on general account
   while that company was controlling and handling the property.
3. The fact that a part of a sum advanced by plaintiff to the P. L.
   Co. on general account was used by the company to pay taxes
   on the property, did not create a lien in plaintiff's favor or en-
   title him to repayment of the amount so paid, as against the
   bank.

4. After the bank had become pledgee for both the P. L. Co. and plaintiff as stated, plaintiff by an additional and supplementary contract with said P. L. Co. agreed to pay certain lienable claims upon the property, but failed to carry out such agreement fully, and the bank was compelled to pay some of such claims. *Held,* that such supplementary contract inured to the benefit of the bank as pledgee, and the bank was entitled to be reimbursed for sums so paid on claims for which a lien might have been filed.

5. In the absence of any evidence, it will be presumed that the law of Michigan at a certain time was the same as our own in relation to liens for supplies furnished in logging operations.

6. One who extends credit to men employed in getting out logs, under an arrangement with the employer by which he is to report the accounts to the latter and the amounts thereof are to be deducted from the amounts due to the men at final settlement, but who does not take an assignment of any specific claim for labor, is not entitled to a lien upon the logs.


APPEAL from a judgment of the circuit court for Waupaca county: CHAS. M. WEBB, Circuit Judge. *Modified and affirmed.*

On July 25, 1892, plaintiff bought of Bradley & Son the stumpage on certain lands in Michigan, near Paulding, on contract for $12,000, paying $4,000 in cash, giving his notes for the balance. On December 27, 1892, he sold to the defendant Paulding Lumber Company the stumpage on part of the same lands for $9,000, payable in six months, with seven per cent. interest, retaining a lien for the entire purchase price. On the same day this contract was modified so that, in case certain of the timber was not cut during the logging season of 1892–93, the time for the payment of $2,500 of the purchase money should be extended for eighteen months. On December 30, 1892, the Paulding Lumber Company assigned its contracts as collateral security to the defendant *German National Bank,* and contracted to pay certain sums due the bank from divers parties named, and such sums as the bank might advance to aid it in cutting and

manufacturing said timber into lumber. The bank agreed to make advances to carry on the work, not to exceed $1,500. On January 28, 1893, plaintiff borrowed from the defendant bank and J. H. Jenkins $4,122 to make the second payment due on the Bradley contract, and assigned to them his interest in the latter contract, and also his contract with the Paulding Lumber Company, assignments absolute in form. The bank, by its president, executed a writing to *Hyde*, reciting that he had left the contracts in trust as collateral for his two notes, and upon payment of the same his contracts were to be returned.

After the Paulding Lumber Company obtained its contract from plaintiff it attempted to do some logging, but, owing to great depth of snow, was able to put in only 30,000 or 40,000 feet. During the summer of 1893 it carried on summer logging. In October, 1893, *Hyde* let a contract to one Lando to cut logs on lands in the Bradley contract unsold. He proceeded to cut during the winter, and delivered the logs at the Paulding Lumber Company sawmill. He quit before finishing his contract, and it was taken up and completed by the Paulding Lumber Company. In the meantime the Paulding Lumber Company made advances to Lando for *Hyde*, and he made large advances to the Paulding Lumber Company, so that the advances in his favor were some $4,000 or $5,000. The bank also made large advances to the Paulding Lumber Company. On February 12, 1894, the bank, at *Hyde's* solicitation, took up the last $4,000 note to Bradley & Son, and held it as collateral security for *Hyde's* note to the bank.

On March 1, 1894, *Hyde* and the Paulding Lumber Company made a contract by which *Hyde* was empowered to pay any claim then existing, or that might thereafter arise, for labor and work done or materials furnished in cutting and sawing the logs into lumber, and have an additional lien for

such payments. The contract also contained a further stipulation on the part of *Hyde* as follows:

"And the said first party promises and agrees that he will pay all claims now existing for the work and supplies aforesaid, and such as shall arise from this date to the first day of April next, inclusive, as shall be subject to liens."

Pursuant to this agreement *Hyde* made further advances, and paid certain claims, which were fully set out in his account, but did not pay all the claims against the logs and lumber stipulated to be paid under the contract last mentioned. During the spring and summer of 1894 the Paulding Lumber Company sawed both the logs cut under its contract and those put in by *Hyde,* and intermingled the lumber so that it could not be separated. The bank continued to make advances to the Paulding Lumber Company, and paid some lien claims hereinafter mentioned. The bank took possession of the lumber, sold it, and received the pay therefor.

On November 21, 1894, *Hyde* commenced this action for his share of the proceeds of such lumber over the amount of his notes. The bank answered at great length, the substance of the answer being that *Hyde* and the Paulding Lumber Company pledged their contracts and the proceeds of the timber and lumber cut from the lands therein described for payment of all advances made and to be made to *Hyde,* to the Paulding Lumber Company, or both; that is, that, so far as the bank and Jenkins were concerned, the separate interests of *Hyde* and the Paulding Lumber Company should stand as joint property, and advances to each should stand as advances on joint account, and that the advances so made exceeded the receipts from lumber sold. Under this asserted agreement it counterclaimed for a lien upon all unsold lumber and all standing pine for the balance its due. The Paulding Lumber Company answered, admitting certain receipts from *Hyde,* and asserting certain offsets, and setting up an agreement to put the lumber taken from all the lands in the Brad-

ley contract in a pool, so that, so far as the bank and Jenkins were concerned, it was to be a joint venture. It also counterclaimed for damages caused by the act and neglect of plaintiff. The counterclaims were each put in issue by proper reply.

To save the expense of an accounting on a basis that might be held incorrect, the parties stipulated that the question of whether the interest of plaintiff was pledged as security for the debts of the Paulding Lumber Company should first be tried, and that the accounting should thereafter proceed on the basis determined by the court. Such issue was tried in 1896 before Judge Chas. M. Webb, who made findings substantially as follows:

(1) Plaintiff did not at any time or in any manner pledge his property to pay the debts of the Paulding Lumber Company. (2) Plaintiff did on January 28, 1893, pledge his interest in the Bradley & Son contract and his interest in the Paulding Lumber Company contracts to the defendant bank to secure the payment of two notes amounting to $4,122. (3) Thereafter the bank advanced to plaintiff $4,000 to take up the last note due on the Bradley contract, taking his note therefor, and holding his note to Bradley & Son as collateral security for the same. (4) As these several notes became due, plaintiff paid the interest and gave new notes, so that on March 10, 1894, the bank held Hyde's notes as follows: Note dated February 12, 1894, eight per cent., $4,000; note dated February 17, 1894, eight per cent., $335.91; note dated March 7, 1894, eight per cent., $2,000; Jenkins note, dated March 10, 1894, $2,122. (5.) Note last mentioned was secured by pledge of plaintiff's interest in said contracts. (6) December 30, 1892, the interest of the Paulding Lumber Company in its contract with plaintiff was pledged to secure money theretofore loaned to it. (7) March 1, 1894, plaintiff agreed to pay claims against the Paulding Lumber Company hereinafter mentioned. (8) Plaintiff claims to have paid

large sums under said contract, and to have a lien on the lumber for the same. (9) The bank claims to have advanced large sums to the Paulding Lumber Company to enable it to carry on its business. (10) The bank also claims to have paid considerable sums to discharge liens. (11) The bank took possession of the logs and lumber cut from the lands described in said several contracts, and has sold the same and holds the proceeds.

*Conclusions of law:* (1) Neither the bank nor Jenkins has any lien upon plaintiff's interest in said contracts, except for the debts owing by him to them, and interest should be computed to such time as the bank had sufficient of the proceeds of said lumber to discharge the same. (2) Plaintiff has a lien upon the logs and lumber cut from the lands described in contract with Paulding Lumber Company, and upon proceeds thereof, to secure him the $9,000 due, which is a first lien. (3) The bank has a lien upon such property, and the proceeds thereof, for its advances. (4) Plaintiff has a lien thereon for money and supplies furnished under the contract of March 1, 1894. (5) That an accounting should be had on the basis of the facts found.

A bill of exceptions was settled, and the case was taken to this court by the defendants. The appeal was dismissed. 96 Wis. 406. Thereupon the case was referred to a referee, under an order requiring him to account separately: (1) The amount loaned by the bank to the Paulding Lumber Company to secure which its contract was pledged; (2) amount paid by bank to discharge liens; (3) amount advanced by plaintiff under the contract of March 1, 1894, with the Paulding Lumber Company; (4) amount paid by him to discharge liens; (5) amount of account of the Paulding Lumber Company against plaintiff.

On the trial before the referee it was stipulated that the accounting should cover all the operations connected with the Bradley pine described in the contract, whether the opera-

tions were before or after the commencement of the suit, and whether included in the pleadings or not, and should extend down to the present time. The testimony taken on the former hearing, and of the parties before trial, was also stipulated into the case. It seems to have been conceded that the total amount received by the bank as the proceeds from the lumber was $29,606.68, and by plaintiff $210.09. A great amount of testimony was taken with reference to the advances made by the bank and the circumstances under which the money was paid. The referee's account was made up with reference to certain vouchers and exhibits offered by the bank, and was not itemized except as it referred to the envelopes containing the exhibits. The contents of each envelope was summarized and carried into the acount in gross amount, so that it is impossible to ascertain the nature of the items allowed, except upon an examination of the testimony in connection with the various exhibits.

The bank's account was stated as follows:

Cash advanced to the Paulding Lumber Company........ $25,843 56
Interest to March 1, 1901............................... 12,477 36
Amount paid to discharge liens......................... 1,994 53
Taxes paid.......................................... 357 38

*Hyde's* account:

Total account allowed................................. $13,244 18
Less amount used to carry on his own operations....... 4,841 30

Balance chargeable to Paulding Lumber Co............. $ 8,402 88
Interest to March 1, 1901............................... 4,087 42
Taxes paid.......................................... 100 00

Paulding Lumber Company account:

Saw bill, etc........................................ $3,883 14
Interest ............................................ 1,875 70

The referee declined to find upon some 109 requests made by defendants, holding that he had no power to determine the ultimate issues in the case. Thereafter some additional testimony was taken, and the cause was finally brought before the

court for determination. The court thereupon made findings as follows:

"The defendant *German National Bank of Oshkosh* has requested me to answer seventeen questions. I have concluded to put my findings of fact in the form of an answer to those seventeen qustions, believing that such questions and answers cover all the issues not disposed of by my findings of fact and conclusions of law upon the first trial hereof. Such questions and my answers thereto are as follows:

"*First.* Was it agreed in February, 1894, that the payment of the claim of *Welcome Hyde* of $9,000 purchase price for the timber sold by him to the Paulding Lumber Company, and for which he had a lien, should be postponed or waived until the bank was paid? No. So decided at first trial before the court.

"*Second.* Was the bank, as the purchaser of the $4,000 note given by *Hyde* to Bradley & Son, part purchase price of the timber, subrogated to all the rights of Bradley & Son? If so, what were the rights of the bank in that regard as against *Welcome Hyde* and the Paulding Lumber Company? Yes. And the bank has the right to have all property exhausted, if necessary to pay this claim. It becomes *Hyde's* debt to the bank. To secure it, he pledged all his interests, including the $9,000 claim vs. Paulding Lumber Company for purchase money of land described in contract 'B'.

"*Third.* Was it agreed that the saw bill for sawing *Hyde* logs should be applied upon the purchase price of $9,000? No. It should be settled or adjusted in the general account.

"*Fourth.* Should the cost of logging the 108,000 feet of *Hyde* logs by the Paulding Lumber Company, amounting to $432, be applied upon the $9,000 purchase price due *Hyde* from the Paulding Lumber Company? No. Should be adjusted in the settlement of accounts between *Hyde* and the Paulding Lumber Company.

"*Fifth.* Were supplies advanced and furnished by the bank to the amount of $2,505.62, which went directly into *Hyde's* logging operations, while Lando was logging for *Hyde* under his independent contract? This should be disposed of on the general account. Was furnished by bank to Paulding Lumber Company. May have been furnished by Paulding Lumber

Company to *Hyde,* and should stand against advances by *Hyde* to Paulding Lumber Company. Practically contemporaneous.

"*Sixth.* Was it agreed that the amount of these advances, so made directly for *Hyde's* benefit, should be applied upon the $9,000 purchase price due *Hyde* from the Paulding Lumber Company? No.

"*Seventh.* Did the bank make payments and advances after March 10, 1894 (the date of *Hyde's* agreement with the Paulding Lumber Company), to avoid liens against this property which had been pledged to the bank, both by *Hyde* and the Paulding Lumber Company? Defendant claims that the amount so paid was $2,010.65. If not that sum, what was the amount? Yes. For taxes, certain labor lien claims, and insurance, as stated by referee.

"*Eighth.* The referee has found that the amount of moneys paid by the *German National Bank* to discharge liens upon this property was $1,751.91. The defendants claim that the amount was greater. What, as a matter of fact, was the amount? The referee's finding in this behalf is correct.

"*Ninth.* Should not the freight, $54.00, paid on 108,000 feet of *Hyde's* logs, and time checks against *Hyde's* logs to the amount of $353.26, and money paid to Joe Boehmer, $131.53, be first repaid to the bank, or, in any event, offset against *Hyde's* claim of $9,000? No. This stands on general account between *Hyde* and the Paulding Lumber Company.

"*Tenth.* What damages, if any, did the defendants suffer by reason of *Hyde's* conduct in delaying logging operations, shipment of lumber, etc.? In other words, the issue raised by the counterclaim in defendants' answer should be disposed of by this court. Proof not satisfactory that any damage was suffered. Bonds to railway company might have been given at any time instead of at a late time, and it is not apparent that defendants did not have timber as soon as they really cared for it.

"*Eleventh.* If this court finds that the Paulding Lumber Company was entitled to damages upon the issues raised by the counterclaim, should not the amount of those damages be offset against the $9,000 purchase price due *Hyde* from the Paulding Lumber Company? No.

"*Twelfth.* It is undisputed in this case that the bank ad-

vanced large sums of money to protect this property and preserve its liens as pledgee. Under the law and undisputed facts, is not the bank entitled to a first lien upon the property for all such advances superior to *Hyde's* lien? Is not the bank entitled to have these amounts first repaid? This question is, in effect, answered negatively by findings in first trial; also by answers to pregoing questions 1, 3, 4, 5, 6, and 7.

"*Thirteenth.* In equity and upon marshaling the assets, in any event and outside of any special agreement between the bank and *Hyde,* should not the saw bill, as well as the amount advanced to Lando for *Hyde's* benefit, about $2,505.62, as well as the amounts advanced by the bank to avoid liens, as well as the cost of logging *Hyde's* logs, and other such items, be offset against the $9,000? Should not this be done in equity, under the rule laid down by the courts in 'application of payments'? No; as before found.

"*Fourteenth.* Were not all of the advances of the bank made in good faith, and after the first advances in January, 1893? Were not such advances made for the purpose of protecting its security and preserving its lien as pledgee? No. Advances were generally under the contract. Much of the evidence tends to prove that the parties so understood at the time. (See answer to foregoing questions 7 and 8.)

"*Fifteenth.* What are the rights of the *German National Bank* as pledgee of the property, the same having been pledged both by *Hyde* and the Paulding Lumber Company? As against *Hyde's* property, the right to take some of his debts to bank and Jenkins; as against the Paulding Lumber Company, the right to take its property to pay its debts to bank.

"*Sixteenth.* What was the amount of money received by the bank from the sale of lumber, and in this connection what was the amount of rotten, worm-eaten, and worthless timber which was cut upon section twenty-one (21) exclusively *Hyde* land? The defendants claim the amount of such rotten timber to be 260,000 feet. As to rotten timber matter, I find for plaintiff.

"*Seventeenth.* As between the bank, *Welcome Hyde,* and the Paulding Lumber Company, how should this account be stated? (As per statement to be filed, with the original copy of these questions.)

"May 9, 1901.                CHAS. M. WEBB, Judge.

"The report of the referee is confirmed so far as it is not inconsistent with these findings. The statement of account between the *German National Bank* and the Paulding Lumber Company stands as stated by the referee. . . .

"The defendant the *German National Bank* asks the following findings, which are approved and adopted accordingly: That there was cut and logged from lands, under contracts 'A' and 'B,' 2,781,316 feet of logs, of which amount 2,000,624 feet of logs belonged to the defendant the Paulding Lumber Company, and 780,692 feet to the plaintiff, *Welcome Hyde*. There was realized from the sale of these logs after they were manufactured into lumber the sum of $29,816.68, of which said amount the defendant the *German National Bank* received $29,606.68, and the plaintiff, *Welcome Hyde,* received $210.09. Of the said sum of $29,816.68, the share of the defendant the Paulding Lumber Company is $20,139.65, and of the plaintiff, *Welcome Hyde,* $9,677.12.

"*Conclusions of law:* (1) The first lien upon the funds in the hands of the *German National Bank,* arising from the sale of Paulding Lumber Company lumber, is a lien in favor of said bank for the amount of its advances, to protect the property by payment of lien claims and taxes, being, as found by the referee, $1,751.91; second, the claim of *Welcome Hyde* for taxes paid to protect this property, $100; third, the claim of *Welcome Hyde* for the amount of the purchase price under contract B, $9,000, with interest from the date of said contract at seven per cent. per annum; fourth, the claim of the *German National Bank* of Oshkosh for advances made by it to the Paulding Lumber Company to carry on the lumber business under its contract with the Paulding Lumber Company, of $24,091.65 and interest; fifth, the balance due *Welcome Hyde* for advances made by him to the Paulding Lumber Company pursuant to his contract of March 1, 1894. (2) That plaintiff, *Welcome Hyde,* have judgment against the *German National Bank* and J. H. Jenkins that they surrender to *Welcome Hyde* his notes to the *German National Bank* and to J. H. Jenkins and to N. B. Bradley, described in finding 4 on the first trial. (3) That plaintiff, *Welcome Hyde,* have and recover of and from the *German National Bank* of Oshkosh the sum of $13,762.77. (4) That the plaintiff, *Welcome Hyde,* recover of the defend-

ant the *German National Bank* of Oshkosh his costs in this action. (5) If it were material to the accounting and pro- duced any different result, the account respecting logs cut by Porter should be independent of the other accounting, and the bank should be allowed a first lien on the lumber cut from such logs for its expenses in cutting the same, provided such expenses did not reduce the net proceeds of such lumber below the fair stumpage value of same; but, inasmuch as such sep- arate accounting would not produce any different result, such separate accounting and statement is omitted.

" The defendant the *German National Bank* asked the fol- lowing conclusion of law. The same is approved and signed accordingly: That the balance in the hands of the bank, after paying amount found due *Hyde,* should be applied upon the indebtedness due to the bank from Paulding Lumber Com- pany."

In the statement of the account between the plaintiff and the bank the court found that on October 24, 1894, the bank received, as the proceeds of sale of the lumber sold, $17,440.02. From this sum he deducted the cost of loading, etc., $856.24, and liens paid, $1,394.53, leaving net balance, $15,189.25. Of this amount, forty-seven per cent., or $7,138.94, was derived from logs cut on plaintiff's land. On October 24, 1894, there was due the bank on plaintiff's notes $8,896.87. The bank should apply the proceeds of the plaint- iff's lumber and enough from the proceeds of the Paulding Lumber Company lumber, $1,757.93, to pay said notes, leav- ing in its hands the sum of $6,292.38. The court further found that the bank received from the cut of 1894, from the proceeds of 108,000 feet of logs cut on plaintiff's lands, and from sawing of 1895, which, with interest to May 24, 1902, left in the hands of the bank $23,695.46. Against this the court allowed plaintiff's claim of $9,000 and interest due him from the Paulding Lumber Company; also for the proceeds of logs cut from his lands; and the sum of $100 and interest, $39.50, for taxes paid on the Paulding Lumber Company sawmill. He deducted $170 for taxes paid by the bank on

plaintiff's lumber.    The total of plaintiff's claim, with the allowance and deduction stated, was $13,762.77.

Many exceptions were filed by the defendants.    Judgment was entered as directed in the findings, from which the defendant bank has taken this appeal.

For the appellant there were briefs by *Barbers & Beglinger,* and oral argument by *Charles Barber.*

For the respondent there were briefs by *Hooper & Hooper,* and oral argument by *Moses Hooper.* .

The following opinion was filed June 19, 1902 :

BARDEEN, J.    The facts in this case are vastly complicated, and the rights of the parties are not easy of ascertainment. The method of trial adopted, and the manner in which the referee's report was made up, has greatly increased the difficulty of following the course of appellant's argument.    The statement of the account by reference to certain exhibits put in evidence has made it necessary to refer to the testimony at length in order to ascertain and understand the conclusions arrived at.    The facts and circumstances in proof have received our careful consideration, and the conclusions we have arrived at are the result of most extended examination of the record.    Such assignments of error as are not noticed are considered not to be well founded or are not of sufficient importance to require extended discussion.

The trial court found that plaintiff did not at any time pledge his interest in the land and contracts mentioned to secure the payment of the debts of the Paulding Lumber Company to the defendant bank.    This conclusion is most earnestly contested.    It was purely a question of fact.    The testimony was voluminous and contradictory.    Nothing would be gained if we were to discuss it at length.    When the plaintiff assigned his contracts to secure the first loan made to him, he received from the president of the bank a writing which so effectually gave character to the transaction

as to leave no room for dispute. That paper recited that plaintiff had left the Bradley and Paulding Lumber Company contracts in trust with the bank as collateral security for his notes, upon the understanding that they were to be returned when the notes were paid. Oral testimony of any other agreement was not admissible. But, assuming that it was, the surrounding circumstances and the subsequent conduct of the parties does not materially alter the situation. The conclusion contended for is out of harmony with all reasonable probabilities, is contrary to plaintiff's express testimony, and opposed to the written document before referred to. There is ample testimony to support the court's conclusions, and we do not see how he could have reached a different result.

His conclusion as to the counterclaims is also well founded, and we see no reason for disturbing the result reached. The testimony of defendants' several witnesses relative to the rotten timber was perfectly impeached by the showing that not a foot of timber from the section where they located such timber ever went into the mill, and by the letters of Mr. Weed describing the timber cut by Lando as " simply excellent." The testimony as to delay in getting logs down was very unsatisfactory and inconclusive, and we fully agree with the statement of the trial court that the "proof was not satisfactory that any damage was suffered."

The item of $62.50 paid by the bank for insurance was a proper one to have been included with the allowance for liens and taxes paid. Its allowance, however, as a first lien with the other items mentioned, does not affect the judgment in the slightest degree. It simply postpones the plaintiff's recovery to that amount, but does not affect the ultimate result.

It is claimed, further, that plaintiff agreed that the saw bill for sawing the logs cut on his lands should be deducted from the purchase price due from the Paulding Lumber Company. The court found against such agreement. Mr. Weed testified

that such an agreement was made and the plaintiff denies it. No claim of any such·agreement was made in the pleadings, either by the bank or the company.    The matter being in dispute, and there being no such preponderance of testimony against the finding as to warrant us in setting it aside, it must stand as a settled fact in the case.

The troublesome question in the case is as to the adjustment of the equities between the bank and the plaintiff with reference to the proceeds of the property.    The bank, being defeated in its claim that plaintiff agreed to pledge his interest in the several contracts as security for its advances to the Paulding Lumber Company, now seeks to hold such advances as paramount to plaintiff's claim for the purchase price of the timber sold the Paulding Lumber Company, on the theory that such advances were essential to the preservation of the property pledged to it by both  parties, and that plaintiff tacitly waived his lien.    No such issue was tendered by the pleadings.    No defense of waiver or estoppel was set up in the answer.    The case stands and must be determined upon the equities of the parties as their rights appear under the contract in evidence.    On the 1st of March, 1894, the bank held an absolute assignment of plaintiff's interest in the Bradley contract and in his contract with the Paulding Lumber Company as security for his notes to Jenkins and the bank.    It also had taken up and held the last note given by plaintiff to the Bradleys to complete the purchase price of the timber, and was undoubtedly subrogated to their rights under the original contract.    It also held the interest of the Paulding Lumber Company in its contract with plaintiff as collateral to certain debts and as security for advances it agreed to make for its benefit.    Prior to this time, under its agreement with the Paulding Lumber Company, the bank had been making large advances to it under its contract, considerably in excess of the amounts it had agreed to advance.    On March 1, 1894, plaintiff made an agreement supplementary to his former one

with the Paulding Lumber Company, by the terms of which plaintiff was given the right to "pay any claim or claims now existing or that may hereafter arise for labor and work done and materials furnished" in the cutting or sawing of the timber mentioned in the original contract, and was given a lien upon the product thereof to the same extent as therein mentioned. In addition, the plaintiff agreed that he would "pay all claims now existing for the work and supplies aforesaid, and such as shall arise from this date to the 1st day of April next inclusive, *as shall be subject to lien.*" Under this contract plaintiff made a number of payments to the company, but failed to carry it out completely, as hereinafter set forth. The bank had knowledge of this contract, and was compelled to pay certain claims which plaintiff had agreed to pay.

The rights of the bank as pledgee are not in dispute. Whatever reasonable expense is incurred by a pledgee in protecting, keeping, or caring for pledged property, and protecting it from liens, taxes, and assessments, and asserting title to it or rendering it available, is a fair charge against the property. *Furness v. Union Nat. Bank,* 147 Ill. 570, 35 N. E. 624; *Hills v. Smith,* 28 N. H. 369; *Starrett v. Barber,* 20 Me. 457; *McCalla v. Clark,* 55 Ga. 53; *Raley v. Ross,* 59 Ga. 862; *Fagan v. Thompson* (C. C.) 38 Fed. 467. The notes given by the several pledgors contained an express power of sale in case of default. Prior to the time the logs were sawed into lumber the bank took no possession. It permitted the Paulding Lumber Company to conduct its business in the regular way, and continued making advances and taking its notes. It gave the plaintiff no notice that it would seek to hold its advances as paramount to his claim against the Paulding Lumber Company, but gave the company full rein to carry on its affairs and handle the property as it saw fit. Cases sometimes arise, as in *Rowan v. State Bank,* 45 Vt. 160, where the creditor takes possession of pledged property in such an unfinished state that a court of chancery would order

it finished by a receiver, and the creditor does in that respect what a court of chancery would have ordered, he will be protected for the advances made. He is protected because he has taken possession and in good faith worked the property into salable condition. In this case the bank must be protected for all claims paid that were liens upon the property or necessary for its preservation, but we know of no rule of law or principle of equity that demands that it shall be reimbursed as against plaintiff's claim for advances made the Paulding Lumber Company on general account while it was controlling and handling the property. Judged by results, the administration of the lumber company was most extravagant and expensive. The circumstances point to the most reckless and extravagant management, and in one instance, at least, to absolute dishonesty. The keeper of the boarding house sold $500 or $600 worth of supplies and decamped. No sufficient books of account were kept. Everybody bought supplies, and money was paid out, and no account kept except on slips of paper. The bank knew of these conditions, and kept on advancing money to the company. If it desired to make its advances a claim paramount for preservation of the property and manufacture of the logs into lumber, it should have taken possession and conducted the business in an economical and prudent manner. See *Boody v. Goddard,* 57 Me. 603. It took possession of the manufactured product and sold it, and, under the court's findings, was allowed the expenses of inspection and loading, together with certain claims for taxes paid and liens satisfied.

The bank now claims that, as against the plaintiff's demand, it should be allowed for all sums it was obliged to pay that plaintiff failed to pay under his contract of March 1st. That he failed to fully carry out that contract is a conceded fact in the case. It is also satisfactorily shown that the bank was compelled to pay certain claims which the plaintiff ought to have paid under his contract. At the date of this contract,

the bank stood as pledgee for both parties to the original con-
tract. The writing of March 1st bound the plaintiff to pay
all claims that were subject to liens accruing before April 1st.
This contract was additional and supplemental to the first
one between the same parties, and we think inured to the ben-
efit of the pledgee. The bank acted on that assumption when
it demanded payment of plaintiff of certain of its advances.
It may be remarked in passing that its conduct in this respect
is entirely inconsistent with its claim that this property had
been pledged by plaintiff as security for the Paulding Lum-
ber Company debt. In making up the account the court al-
lowed the bank a first lien on the property for $1,394.53 paid
September 1, 1894, to discharge a lien for labor on the prop-
erty. Of this amount $543.53 of the Barnette claim, $280
of the Morse claim, and $60 of the Boehmer claim, aggregat-
ing $883.53, was for labor performed by them prior to April
1, 1894, and which plaintiff was under direct obligation to
pay. On April 9, 1894, a committee of the bank went to
Paulding, and took up and paid the following claim:

| | |
|---|---|
| Ex. 4a 43 ............................................. | $  912 42 |
| Ex. 4a 44 ............................................. | 311 70 |
| Ex. 4a 46 ............................................. | 786 53 |
| Total ....:........................................ | $2,010 65 |

The bank insists that these claims were lienable, and should
be charged against plaintiff's claim for purchase money.

The first is a claim for supplies furnished by Barnette to
the Paulding Lumber Company prior to April 1st, which were
used in its logging and sawing operations. It will be ob-
served that plaintiff's engagement was to pay for such work
and supplies "as shall be subject to liens." The Paulding
Lumber Company's operations were carried on in the state of
Michigan. No proof of the law of that state in relation to a
lien for supplies was given. In such case we must presume
the law of Michigan to be the same as our own. _MacCarthy_

*v. Whitcomb,* 110 Wis. 113, 85 N. W. 707. No law of this state, of which we are aware, gave any lien for supplies furnished in logging operations. Such being the case, plaintiff was under no legal obligation to pay the bill mentioned. Ch. 139, Laws of 1891, which was in force at the date of this transaction, only gives a lien for labor.

The second claim above mentioned was for labor claims paid. As near as we can get at the circumstances from the confused way in which the evidence appears in the printed case, Morse, who was employed in working on the logs, became the owner of various claims for labor performed by workmen upon these logs prior to April 1, 1894, for which he might have filed a lien. The claim was paid by the bank before any lien was filed. The claim as a whole came within the terms of plaintiff's engagement, and, being one that was directly enforceable against the property, no good reason is perceived why he should not respond to the bank for the amount thereof.

The third claim arose in this way: One Fletcher kept a saloon at Paulding. The men there employed patronized him with great liberality. Under some arrangement with the company, Fletcher reported his accounts to the persons in charge, and the amount of the saloon accounts was deducted from the amount due each man at final settlement. While it is true the amount so paid, in a way, represented work done upon the logs, Fletcher had no claim that he could enforce. There was no transfer to him of any specific claim, and none of the many claims he held were subject to liens in his hands. The bank, therefore, obtained no legal right to charge plaintiff for the amount so paid.

We conclude from the foregoing that plaintiff was under direct legal obligation to the Paulding Lumber Company to pay said sum of $883.53 of the lien claim paid by the bank on September 1, 1894, and also the sum of $311.70 paid April 9, 1894. In equity we think this obligation inures to the benefit of the bank. It was compelled to pay out these sev-

eral sums to protect the property, and because the plaintiff failed to carry out his contract. In doing equity between the parties, we think these sums should be deducted from the amount due plaintiff from the Paulding Lumber Company, so that the bank shall be in no worse position because of plaintiff's default. It does not properly meet the existing conditions to give the bank a first lien upon the whole property for these payments. The proceeds of the property were not sufficient to meet all demands. Hence, in the adjustment of the equities of the parties, the intervening circumstances should be considered, and the results of plaintiff's default be declared to rest upon him, rather than others who suffer no default. This adjustment leaves the bank in the same position as it would have been had the plaintiff carried out his agreement.

What has been said regarding a lien for supplies applies to the claim made by the bank for reimbursement for the Mendel, Smith & Co. bill paid by it. It is in no position to enforce claims against plaintiff except such as were "subject to liens."

Under the court's findings, the bank received sufficient funds from the proceeds of this lumber, on October 24, 1894, to cancel the plaintiff's indebtedness to the bank in full, and to leave several thousand dollars applicable on the amount due plaintiff from the Paulding Lumber Company. In subsequent transactions he stood as the owner of the property, upon which the bank had the second claim. Its advancements thereafter, while resulting to plaintiff's benefit in a way, were also for its own benefit as well. It made no attempt to take possession of the property and conduct the business. It gave plaintiff no notice that it would seek to hold the various advances as having been made for the absolute protection of the property. On the contrary, it permitted the Paulding Lumber Company to continue its reckless and extravagant management, and continued to turn over money, which, the result

shows, must have been diverted to other purposes. The circumstances furnish no ground for holding that the bank should be preferred as against plaintiff's claim.

The court allowed plaintiff $100 and interest, $39.50, "for taxes paid as found by referee." The only evidence in the record bearing upon this matter was given by Mr. Barnette, who was an officer of the Paulding Lumber Company. It is to the effect that in January, 1894, Mr. Weed gave him some money, which he said came from plaintiff. Witness used it generally to pay bills, and paid $80 taxes on the mill, and $10 taxes on the land upon which the mill stood. So far as anything that appears in the record shows, plaintiff's advance was on general account. No circumstance is suggested why plaintiff should be preferred for this item more than any other, save that the company happened to use a part of the money advanced to pay its taxes. This is not sufficient to create a lien in plaintiff's favor. There being no proof that the advance was made for the specific purpose, or that it was anything more than a payment on their general account, we think the court erred in allowing this item.

The judgment will be modified by striking out the allowance of taxes and interest last mentioned, and by deducting therefrom the sum of $883.53 and legal interest from September 1, 1894, and the further sum of $311.70 and interest from April 9, 1894. The account between the parties may be adjusted accordingly, and the judgment as so modified is affirmed.

*By the Court.*—So ordered. Costs will be taxed in favor of appellant.

A motion for a rehearing was denied September 23, 1902.